[Crim. No. 20076. Sept. 7, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
LAWRENCE J. RAMIREZ, Defendant and Appellant.

**COUNSEL**

Rowan K. Klein, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Robert F. Katz and Stephen M. Kaufman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—In this case we review the scope of the due process clauses of the California Constitution. (Cal. Const., art. I, § 7 subd. (a); *id.,* § 15.) ▉ We hold that application of the clauses must be deter-

mined in the context of the individual's due process liberty interest in freedom from arbitrary adjudicative procedures. Thus, when a person is deprived of a statutorily conferred benefit, due process analysis must start not with a judicial attempt to decide whether the statute has created an "entitlement" that can be defined as "liberty" or "property," but with an assessment of what procedural protections are constitutionally required in light of the governmental and private interests at stake.

Appellant Lawrence J. Ramirez was convicted of second degree burglary in 1970 (Pen. Code, § 459), and in 1971 he pleaded guilty to possession of heroin (Health & Saf. Code, § 11500).[1] After adjourning criminal proceedings in each case, the court adjudged appellant to be a narcotic addict or in imminent danger of becoming a narcotic addict within the meaning of Welfare and Institutions Code section 3051. It thus committed him for treatment in the California Rehabilitation Center (CRC).

In 1974 appellant was granted outpatient status pursuant to Welfare and Institutions Code section 3151. Two years later he was arrested and charged with resisting arrest and disturbing the peace. The first charge was dropped; he pleaded guilty to the second. The Director of Corrections (Director) subsequently found he was "not a fit subject for confinement or treatment" in the CRC.

After a hearing on the propriety of the order excluding appellant from the CRC, the superior court held the Director did not abuse his discretion. Appellant's CRC commitment was subsequently terminated and criminal proceedings against him were resumed. In case No. A-254109 the court suspended imposition of sentence on the burglary conviction; it granted three years' summary probation with six months in county jail as a condition thereof, and deemed the offense a misdemeanor pursuant to Penal Code section 17. In case No. A-419523 the court upheld the exclusion order after appellant waived his right to a further hearing and submitted the question on the earlier disposition in case No. A-254109; it then sentenced him to state prison for the narcotics offense.

This consolidated appeal is purportedly taken from the order excluding appellant from the CRC in case No. A-254109, and from the judgment and exclusion order in case No. A-419523. ■ No appeal lies from the

---

[1]This provision, which proscribed possession of any narcotic other than marijuana, was repealed in 1972. (See Stats. 1972, ch. 1407, § 2, p. 2987.) A similar provision, Health and Safety.Code section 11350, was added. (See Stats. 1972, ch. 1407, § 3, p. 2987.)

nonjudicial order of exclusion by the Director. Review of such orders for abuse of discretion is available in the trial court upon the return of the defendant for resumption of the criminal proceedings, however, and following such review on appeal from the judgment. (*People* v. *Montgomery* (1967) 255 Cal.App.2d 127, 131 [62 Cal.Rptr. 895].) Because imposition of judgment was suspended and probation granted in case No. A-254109, we treat the appeal in that case as an appeal from the order granting probation. (Pen. Code, § 1237, subd. 1; *People* v. *Flores* (1974) 12 Cal.3d 85, 94 [115 Cal.Rptr. 225, 524 P.2d 353].) In case No. A-419523, the ruling of the trial court upholding the exclusion order is reviewable on this appeal from the judgment.

Appellant contends the procedures used by the CRC in excluding him from its program denied him his constitutional right to procedural due process. We agree.

I

The initial question presented is whether the due process clauses of the California Constitution mandate that an individual be granted procedural protections prior to his exclusion from the CRC. (Cal. Const., art. I, § 7 subd. (a); *id.*, § 15.) We begin our analysis by examining United States Supreme Court decisions discussing the federal due process clause. The federal cases support the conclusion that a person confined in the CRC has acquired a liberty interest that warrants due process protection. The reasoning of such cases, however, requires some refinement in order to determine the appropriate standards for invoking the state clauses.

In interpreting the federal clause, the Supreme Court has held that a prisoner may derive a due process liberty interest from either the Constitution or state law. (*Meachum* v. *Fano* (1976) 427 U.S. 215, 226 [49 L.Ed.2d 451, 460, 96 S.Ct. 2532].) When the asserted interest is derived exclusively from state law, it will be recognized as within the scope of due process liberty if the state statute protects the interest by permitting its forfeiture only on the happening of specified conditions. For example, in *Wolff* v. *McDonnell* (1974) 418 U.S. 539 [41 L.Ed.2d 935, 94 S.Ct. 2963], the Supreme Court held that a prisoner's loss of "good-time credits"—a loss that could result in lengthening his incarceration—and his solitary confinement are within the scope of due process liberty when conditioned on the prisoner's serious misbehavior. And similarly, the Supreme Court concluded in *Morrissey* v. *Brewer* (1972) 408 U.S. 471 [33 L.Ed.2d 484, 92 S.Ct. 2593], that the parolee acquires a protected liberty interest in his

conditional freedom because it cannot be revoked absent the occurrence of specified events.

By contrast, in cases in which a statute does *not* protect an interest by specifying that its loss is subject to the happening of some condition, a protected liberty interest is not created under federal law. Thus, in *Meachum* v. *Fano, supra,* 427 U.S. at pages 226-227 [49 L.Ed.2d at pages 460-461], the Supreme Court held that a prisoner has no due process liberty interest when he is being transferred from one institution to another, despite any alleged hardship that might result, so long as the discretionary authority to make such transfers is not limited by statute and the transfer would not otherwise infringe upon a constitutional right. And in *Montanye* v. *Haymes* (1976) 427 U.S. 236 [49 L.Ed.2d 466, 96 S.Ct. 2543], the same holding was applied even though the transfer was ordered for disciplinary purposes.

In the case before us, Welfare and Institutions Code section 3053 requires that before the Director may exclude a person from the CRC, he must conclude "that the person, because of *excessive criminality* or for other *relevant reason,* is not a fit subject for confinement or treatment. . . ." (Italics added.) Although the words "other relevant reason" permit the Director broad discretion in making his decision, that discretion is not unlimited. Thus, since exclusion is conditioned by the terms of the statute, the patient-inmate's interest in remaining in the CRC is apparently within the scope of due process liberty and therefore warrants some degree of procedural protection.

Although we agree with this conclusion, the reasoning appears anomalous. Its effect is that as long as the interest is *not* one that would otherwise fall within the scope of constitutional concepts of liberty, the state may "define it out" of the due process clause by specifying that it is subject to the unconditional discretion of the person in charge of its administration; further, the state may apparently limit the scope of the clause in this manner irrespective of the extent to which "grievous loss" or "substantial adverse impact" results. (See *Meachum* v. *Fano, supra,* 427 U.S. at p. 224 [49 L.Ed.2d at pp. 458-459]; *Montanye* v. *Haymes, supra,* 427 U.S. at p. 242 [49 L.Ed.2d at p. 471].) The Supreme Court's doctrine has thus been criticized as ultimately leading to circular reasoning that contravenes the clause by leaving the state free to decide whether and to what extent procedures are to be followed in dealings with its citizens without regard to federal standards. (Comment, *Entitlement, Enjoyment, and Due Process of Law* (1974) Duke L.J. 89, 111; see also Saphire,

*Specifying Due Process Values: Toward a More Responsive Approach to Procedural Protection* (1978) 127 U.Pa.L.Rev. 111, 140 [hereinafter cited as Saphire, *Specifying Due Process Values*]; Van Alstyne, *Cracks in "The New Property": Adjudicative Due Process in the Administrative State* (1977) 62 Cornell L.Rev. 445, 460-470 [hereinafter cited as Van Alstyne, *Cracks in the New Property*]; Comment, *Two Views of a Prisoner's Right To Due Process: Meachum v. Fano* (1977) 12 Harv.Civ.Rights-Civ.Lib.L.Rev. 405, 416-417.)

The foregoing analysis leads us to conclude that the federal approach for determining whether a due process liberty interest is at stake masks fundamental values that underlie the clause. Initially, the approach fails to give sufficient weight to the important due process value of promoting accuracy and reasonable predictability in governmental decision making when individuals are subject to deprivatory action. The Supreme Court itself has stated that "The touchstone of due process is protection of the individual against arbitrary action of government [citations]." (*Wolff* v. *McDonnell* (1974) *supra,* 418 U.S. at p. 558 [41 L.Ed.2d at p. 952].) And, as one federal circuit court observed with respect to occupations controlled by government, "The public has the right to expect its officers . . . to make adjudications on the basis of merit. The first step toward insuring that these expectations are realized is to require adherence to the standards of due process; absolute and uncontrolled discretion invites abuse." (*Hornsby* v. *Allen* (5th Cir. 1964) 326 F.2d 605, 610.) If minimizing such abuses of governmental discretion is to be a concern, it is misguided for courts to rest the applicability of the clause on whether or not the state limits administrative control over a statutory benefit or deprivation by the occurrence of specified conditions; instead, courts must evaluate the extent to which procedural protections can be tailored to promote more accurate and reliable administrative decisions in light of the governmental and private interests at stake.

The federal approach also undervalues the important due process interest in recognizing the dignity and worth of the individual by treating him as an equal, fully participating and responsible member of society. (See Karst, *Supreme Court, 1976 Term—Foreword: Equal Citizenship Under the Fourteenth Amendment* (1977) 91 Harv.L.Rev. 1, 5-11 [hereinafter cited as Karst, *Equal Citizenship*]; Mashaw, *The Supreme Court's Due Process Calculus for Administrative Adjudication in Mathews v. Eldridge: Three Factors in Search of a Theory of Value* (1976) 44 U.Chi.L.Rev. 28, 49-54; Saphire, *Specifying Due Process Values* (1978) *supra,* 127 U.Pa.L.Rev. 111, 143-151.) "For government to dispose of a

person's significant interests without offering him a chance to be heard is to risk treating him as a nonperson, an object, rather than a respected, participating citizen." (Karst, *Equal Citizenship* (1977) *supra,* 91 Harv.L. Rev. at p. 30.) Thus, even in cases in which the decision-making procedure will not alter the outcome of governmental action, due process may nevertheless require that certain procedural protections be granted the individual in order to protect important dignitary values, or, in other words, "to ensure that the method of interaction itself is fair in terms of what are perceived as minimum standards of political accountability—of modes of interaction which express a collective judgment that human beings are important in their own right, and that they must be treated with understanding, respect, and even compassion." (Saphire, *Specifying Due Process Values* (1978) *supra,* 127 U.Pa.L.Rev. at p. 159.)

■    We therefore hold that the due process safeguards required for protection of an individual's statutory interests must be analyzed in the context of the principle that freedom from arbitrary adjudicative procedures is a substantive element of one's liberty. (See Van Alstyne, *Cracks in the New Property* (1977) *supra,* 62 Cornell L.Rev. at p. 487.) This approach presumes that when an individual is subjected to deprivatory governmental action, he always has a due process liberty interest both in fair and unprejudiced decision-making and in being treated with respect and dignity. Accordingly, it places front and center the issue of critical concern, i.e., what procedural protections are warranted in light of governmental and private interests.

■    In determining applicable due process safeguards, it must be remembered that "due process is flexible and calls for such procedural protections as the particular situation demands." (*Morrissey* v. *Brewer* (1972) *supra,* 408 U.S. at p. 481 [33 L.Ed.2d at p. 494].) For example, in *Wolff* v. *McDonnell* (1973) *supra,* 418 U.S. 539, the procedure held necessary to protect a prisoner's liberty interest in avoiding loss of good-time credits or solitary confinement was (1) advance written notice of the claimed violation, (2) a written record of the proceedings, including a statement by the factfinders as to the evidence relied on and the reasons for the disciplinary action taken, and (3) the right "to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." (*Id.,* at pp. 563-566 [41 L.Ed.2d at pp. 954-957].) By contrast, in *Goss* v. *Lopez* (1975) 419 U.S. 565 [42 L.Ed.2d 725, 95 S.Ct. 729], which involved the 10-day suspension of a child from school, only notice of the charge and a limited opportunity to respond were required. And in

*Cafeteria Workers* v. *McElroy* (1961) 367 U.S. 886 [6 L.Ed.2d 1230, 81 S.Ct. 1743], it was recognized that the dismissal of a cook employed in a cafeteria at a military installation implicated the due process clause; nevertheless, after observing that her employer was prepared to employ her at another of its restaurants, that the withdrawal was not likely to injure her reputation, and that her employment opportunities elsewhere were not impaired, the Supreme Court held that the employee was not entitled to a due process hearing to refute the grounds for her termination. The court reasoned that the very limited individual interest in this one job did not outweigh the government's authority over an important military establishment. It did note, however, that the employee would have been entitled to relief "if the announced grounds for her exclusion had been patently arbitrary or discriminatory." (*Id.,* at p. 898 [6 L.Ed.2d at p. 1238].)

These cases disclose that the extent to which due process relief will be available depends on a careful and clearly articulated balancing of the interests at stake in each context. In some instances this balancing may counsel formal hearing procedures that include the rights of confrontation and cross-examination, as well as a limited right to an attorney. (See, e.g., *Morrissey* v. *Brewer, supra,* 408 U.S. 471; *In re Bye* (1974) 12 Cal.3d 96 [115 Cal.Rptr. 382, 524 P.2d 854].) In others, due process may require only that the administrative agency comply with the statutory limitations on its authority. (See, e.g., *Cafeteria Workers* v. *McElroy, supra,* 367 U.S. 886.) More specifically, identification of the dictates of due process generally requires consideration of (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, (3) the dignitary interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible governmental official, and (4) the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. (See *Civil Service Assn.* v. *City and County of San Francisco* (1978) 22 Cal.3d 552, 561 [150 Cal.Rptr. 129, 586 P.2d 162].)

## II

In applying this analysis to the facts herein, we consider first the CRC patient-inmate's interests. Appellant contends that as a result of his exclusion from the CRC, he will (1) suffer the grievous loss of liberty

from being sentenced to state prison, and (2) lose the opportunity for treatment and rehabilitation offered by the CRC program. He therefore argues he is entitled to the procedural due process safeguards mandated by *Morrissey* v. *Brewer* (1972) *supra,* 408 U.S. 471.

*In re Bye* (1974) *supra,* 12 Cal.3d 96, examined whether an outpatient at the CRC must be accorded the *Morrissey* procedural requirements when the Director revoked his outpatient status. The issue in *Morrissey* was the extent to which the due process clause entitled a parolee to procedural protections prior to the revocation of his parole. The United States Supreme Court, through Chief Justice Burger, characterized the parolee's interest as follows: "The liberty of a parolee enables him to do a wide range of things open to persons who have never been convicted of any crime. The parolee has been released from prison based on an evaluation that he shows reasonable promise of being able to return to society and function as a responsible, self-reliant person. Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison. He may have been on parole for a number of years and may be living a relatively normal life at the time he is faced with revocation." (*Morrissey* v. *Brewer, supra,* 408 U.S. at p. 482, fns. omitted [33 L.Ed.2d at pp. 494-495].)

In *Bye* we recognized that the liberty interest of a CRC *outpatient* is similar to that of a parolee. (12 Cal.3d at pp. 101-102.) We therefore held that the outpatient was entitled to a *Morrissey*-type hearing before the CRC could revoke his outpatient status. (*Id.,* at p. 110.)

In this case appellant does not claim he was denied his due process rights with respect to the revocation of his *outpatient* status.[2] He argues

---

[2]Although his outpatient status was revoked prior to his exclusion from the CRC, appellant contends only that he was "denied due process in his *exclusion* from the California Rehabilitation Center." (Italics added.) Moreover, when arguing before the superior court, appellant's attorney stated that whether a person is an inpatient or outpatient, when he is excluded from the CRC, "The interest is the same. It is the right to be a part of the CRC program, which we have mandated for its right to treatment for the benefits that it will give and for the positive detriment that the person can suffer if he is excluded. . . . I wouldn't make any distinction between an inpatient and an outpatient." Finally, appellant challenges the constitutionality of only the Director's action pursuant to Welfare and Institutions Code section 3053, which authorizes the Director to exclude persons from the CRC altogether; he does not contest any action taken under section 3152, which authorizes the revocation of outpatient status.

Our holding today, of course, does not mean that a person challenging the revocation

only that when the Director excludes a person from continuing as an *inpatient* at the CRC, *Morrissey*-type procedural safeguards must be applied. The argument misconceives the nature of the individual's interest in continued confinement in the CRC. Although the Legislature has eliminated many of the original criminal indicia surrounding the narcotics addict commitment program (see generally *In re De La O* (1963) 59 Cal.2d 128 [28 Cal.Rptr. 489, 378 P.2d 793, 98 A.L.R.2d 705]; Belton, *Civil Commitment of Narcotics Addicts in California: A Case History of Statutory Construction* (1968) 19 Hastings L.J. 603, 605-614 [hereinafter cited as Belton, *Civil Commitment*]), we have nevertheless recognized the realities of confinement in the CRC. Thus in *People v. Moore* (1968) 69 Cal.2d 674 [72 Cal.Rptr. 800, 446 P.2d 800] (overruled on other grounds in *People v. Thomas* (1977) 19 Cal.3d 630, 641, fn. 8 [139 Cal.Rptr. 594, 566 P.2d 228]) we held that the rule excluding illegally obtained evidence is applicable to proceedings for commitment to the CRC. We reasoned that "Narcotic addict proceedings involve a loss of liberty, and the proceedings are for the benefit of society as well as the addict. (Welf. & Inst. Code, § 3000; *People v. Victor* [1965] 62 Cal.2d 280, 292 [42 Cal.Rptr. 199, 398 P.2d 391]; *People v. Ortiz* [1964] 61 Cal.2d 249, 255 [37 Cal.Rptr. 891, 391 P.2d 163]; *In re De La O, supra,* 59 Cal.2d 128, 148.) Whatever the label that may be attached to those proceedings, it is apparent that there is a close identity to the aims and objectives of criminal law enforcement [citation]. . . ." (*Id.,* at p. 682.)

Again, in *People v. Thomas, supra,* 19 Cal.3d 630, we held that a person whom the state seeks to commit to CRC is entitled to the procedural due process safeguards of proof beyond a reasonable doubt and a unanimous jury verdict. Addressing specifically the nature of confinement in the CRC, we concluded that it resulted in a substantial loss of personal liberty: "Although the CRC is not among the facilities specifically listed as state prisons (Pen. Code, §§ 2000-2049.6), it is nonetheless 'under the jurisdiction of the Department of Corrections' (Welf. & Inst. Code, § 3300), its 'supervision, management and control' is vested in the Director of Corrections (§ 3305), and its superintendent is appointed 'pursuant to Section 6050 of the Penal Code,' which provides for the appointment of state prison wardens (§ 3304). The purpose of the CRC is not only treatment and rehabilitation but also the 'control' and 'confinement' of persons committed thereto. (§ 3301; see also §§ 3000, 3001.) The

---

of his outpatient status can be denied a *Morrissey*-type hearing on the ground that he has also been excluded from the CRC. Further, in cases in which a person chooses to challenge both his outpatient status revocation and his exclusion from the CRC, the CRC certainly may decide that administrative convenience warrants expanding the scope of the *Morrissey*-type hearing to dispose of the exclusion issue simultaneously.

rules governing the facility are made by the Director of Corrections (§ 3303), and the general state prison regulations of part 3 of the Penal Code 'apply to said institution as a prison under the jurisdiction of the Department of Corrections and to the persons confined therein insofar as such provisions may be applicable.' (§ 3305.) Finally, every person who escapes or attempts to escape from such custody 'is guilty of a crime punishable by imprisonment in the state prison.' (§ 3002.) In short, as we recently characterized this confinement, a person committed or recommitted as a narcotics addict 'is incarcerated in the walled facility at Norco [i.e., the CRC], a security institution . . . .' (*In re Bye* (1974) *supra,* 12 Cal.3d 96, 102.)" (*Id.,* at pp. 638-639, fn. omitted.)

In sharp contrast to an outpatient or a parolee, therefore, a patient-inmate confined in the CRC cannot "do a wide range of things open to persons who have never been convicted of any crime." (*Morrissey v. Brewer* (1972) *supra,* at p. 482 of 408 U.S. [at pp. 494-495 of 33 L.Ed.2d].) It follows that the liberty interest that justified a *Morrissey*-type hearing in *Bye* does not exist in the present context.[3]

It is true, as appellant argues, that a patient-inmate has an important interest in receiving treatment at the CRC for his narcotics addiction. In examining this interest, however, we must recognize that by the time the patient-inmate is admitted to the CRC he has experienced the withdrawal process and his original physical addiction has subsided; the institution provides treatment to eliminate his psychological dependency on narcotics.[4] While psychological counseling certainly is valuable to the patient-inmate because it increases the likelihood that he will not resume the use of narcotics, examination of the nature of the CRC program reveals important interests of the CRC and of other persons being treated that suggest elaborate procedural requirements would be inappropriate.

---

[3]While due process requires consideration of the possibility that the superior court will sentence a patient-inmate to a more restrictive security institution after it reassumes criminal jurisdiction, we believe his interest in this respect is sufficiently protected by the procedures required to prevent the arbitrary deprivation of the treatment for narcotics addiction he is receiving at the CRC. (See *post.*)

[4]The program at the CRC employs group treatment for patient-inmates by psychologists and counselors on a continuing basis (Wood, *The Civil Narcotics Program: A Five Year Progress Report* (1967) 2 Lincoln L.Rev. 116, 119-122 [hereinafter cited as Wood, *The Civil Narcotics Program*]), and offers various other services. (*Id.,* at pp. 122-126.) After an unspecified period of treatment and observation, the CRC may request that the Narcotic Addict Evaluation Authority release a patient-inmate on an outpatient basis. (Welf. & Inst. Code, §§ 3150 & 3151.) The outpatient is closely supervised and subject to surprise testing. (*Id.,* § 3152.) On the whole, the CRC program has demonstrated that there is hope for the addict in a closely supervised nonpunitive setting. (Wood, *The Civil Narcotics Program, supra,* 2 Lincoln L.Rev. at p. 116.)

It has been observed that "those who are receiving treatment [in the CRC] must be able to function effectively in a minimum security setting, cooperate with fellow-patients and counselors in group therapy and work programs, and assume a certain degree of responsibility and self-reliance. Not all criminal defendants, unfortunately, exhibit these qualities. Thus a record showing a history of serious criminal acts not primarily the result of narcotics addiction, interrupted only by abortive efforts at probation or reform, suggests that the individual might well be a poor risk in the civil rehabilitation program: not only would he be unlikely to respond personally to the noncoercive form of treatment adopted, but his negative and criminally hardened attitude towards all manifestations of authority and attempts at rehabilitation would tend to interfere with the progress of other patients and disrupt the operation of the program as a whole." (Belton, *Civil Commitment, supra,* 19 Hastings L.J. at p. 633, fns. omitted.) Thus, when the Director excludes a person from the CRC, "the intent is to eliminate from the program the more aggressive or more criminally sophisticated persons, in order that they (or the potential they represent) will not interfere with efforts to deal with addicts in a minimum custody treatment setting." (Wood, *The Civil Narcotics Program, supra,* 2 Lincoln L.Rev. at p. 129.) Accordingly, we have previously recognized that transfers of uncooperative inmates to a more secure setting is proper "to maintain reasonable security in the operation of the narcotic addict rehabilitation program, and thereby more efficiently promote the potential benefits of the project for all inmates, including petitioner as his responses might ultimately permit." (*In re Cruz* (1965) 62 Cal.2d 307, 316, fn. omitted [42 Cal.Rptr. 220, 398 P.2d 412].)

It is apparent, therefore, that central to an exclusion decision is the Director's evaluation of (1) the probabilities of an addict's success and (2) the effect of retaining the addict in the CRC on the successful treatment of others. This evaluation is inherently subjective and requires the Director's cumulative appraisal of a wide variety of considerations, such as the history of the patient-inmate, his responses to CRC treatment, psychiatric reports and whatever other factors might be deemed relevant.

In weighing the private interests of the person being excluded against the administrative needs of the CRC, it is important to recognize that this type of evaluation is not so readily adapted to procedural due process safeguards as are decisions that turn on specific factual questions (see *Board of Curators, Univ. of Mo.* v. *Horowitz* (1977) 435 U.S. 78, 90 [55 L.Ed.2d 124, 135, 98 S.Ct. 948]), such as whether a prisoner has violated a condition of his parole (*Morrissey* v. *Brewer* (1972) *supra,* 408 U.S. 471);

whether a person has engaged in conduct subject to discipline (*Wolff* v. *McDonnell* (1974) *supra,* 418 U.S. 539 [prisoner]; *Goss* v. *Lopez* (1975) *supra,* 419 U.S. 565 [student]; *Civil Service Assn.* v. *City and County of San Francisco* (1978) *supra,* 22 Cal.3d 552 [city employees]); or whether a person meets the conditions required to be eligible for welfare (*Goldberg* v. *Kelly* (1970) 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011]). Nevertheless, a person challenging the Director's decision has important interests in (1) being informed of the nature of and reasons for the proposed action, (2) ensuring that the Director does not base his decision on erroneous or irrelevant facts, and (3) presenting his case for not being excluded.

Before determining what safeguards are warranted in light of these interests, we examine the present procedure for exclusion from the CRC. The procedure includes a judicial hearing conducted by the superior court when it reassumes criminal jurisdiction. (Welf. & Inst. Code, § 3053.) At that time the court will ask whether legal cause for the exclusion exists, and hear challenges concerning its propriety. (*People* v. *Hannagan* (1967) 248 Cal.App.2d 107, 115 [56 Cal.Rptr. 429].) In so doing, the court "has authority to review [the Director's] action for the purpose of determining whether or not the rejection constituted an abuse of discretion; upon request by the defendant must undertake such a review and conduct a hearing; in reviewing the decision may rely upon the record and information furnished by the director, as well as other pertinent evidence; and, in the event it determines there was an abuse of discretion, should require the director to reconsider his decision or should return the defendant to the rehabilitation center for execution of its original commitment order." (*People* v. *Montgomery, supra,* (1967) 255 Cal.App.2d 127, 131 [62 Cal.Rptr. 895].)

Thus in cases in which the Director's decision is based solely on incorrect considerations, subsequent judicial review by the trial court sufficiently protects due process interests in the promotion of accuracy and reliability of exclusion decisions: the court may send such cases back to the Director or reinstate the patient-inmate, whichever it deems more appropriate. If other, correct evidence supports the Director's decision, however, a deferential abuse-of-discretion standard may lead to affirmance even though the Director might not have reached the same conclusion if he had known certain asserted facts were incorrect. A similar problem exists with respect to the patient-inmate's interest in presenting his case for not being excluded: if his case were called to the attention of the Director prior to his reaching a final decision, he might

be dissuaded from deciding in favor of exclusion even though the evidence would have been sufficient to support exclusion when reviewed at the subsequent judicial hearing.

■ For the foregoing reasons, we conclude that the due process clause entitles the patient-inmate to an opportunity to respond to the grounds for the exclusion prior to the final exclusion decision. To make such an opportunity meaningful, the patient-inmate must be given a statement of those grounds, access to the information that the Director considered in reaching his decision,[5] and notice of the right to respond. He also must be permitted to exercise his right to respond orally before a responsible official if he so chooses. Such oral participation may be useful in resolving conflicting information and in the introduction of subjective factors into the decision-making process that might otherwise not be considered; it thereby may often tend to enhance the accuracy and reliability of the exclusion decision. And even in cases in which such participation is unlikely to affect the outcome of the decision, it nevertheless promotes important dignitary values that underlie due process. Indeed, one commentator has stated that "Only through [oral] participation can the individual gain a meaningful understanding of what is happening to her, and why it is happening. Moreover, providing the opportunity to react—to register concern, dissatisfaction, and even frustration and despair—is the best method to promote the feeling that, notwithstanding the substantive result, one has been treated humanely and with dignity by one's government." (Saphire, *Specifying Due Process Values* (1978) *supra*, 127 U.Pa.L.Rev. at pp. 164-165, fn. omitted.)

■ A more difficult question is whether confrontation, cross-examination, and other formal hearing rights must be provided. The principal value fostered by such rights in these circumstances is that of promoting accuracy and reliability in governmental decision-making. (See *id.*, at p. 165.) As previously discussed, the Director's decision is evaluative in nature and based on his specialized subjective judgment; that judgment depends on consideration of a host of intangible factors rather than on the existence of particular and contestable facts. As a result, more formal procedures than those previously identified would not

[5]In some cases, however, the need for confidentiality may provide a sufficiently compelling reason for denying a patient-inmate access to certain limited types of information. Because the Attorney General does not allege that any need for confidentiality exists in this case, we need not decide the question of when such denial is justified. (But see *In re Prewitt* (1972) 8 Cal.3d 470, 474-478 [105 Cal.Rptr. 318, 503 P.2d 1326]; *In re Love* (1974) 11 Cal.3d 179, 184-185 [113 Cal.Rptr. 89, 520 P.2d 713]; *In re Olson* (1974) 37 Cal.App.3d 783, 788-791 [112 Cal.Rptr. 579].)

reduce the likelihood of an erroneous determination, unless the individual challenging the decision could confront and cross-examine all the experts and persons who contributed information to his case history and to his psychiatric reports and criminal record. Even then, the marginal value to the individual would seem to be relatively insignificant because of the difficulties inherent in challenging the subjective aspects of an evaluative-type decision. Moreover, such extensive procedures would substantially impair administrative efficiency. Consequently we do not believe they are needed to protect the interests of the excluded CRC patient-inmate. (Cf. *People* v. *Arbuckle* (1978) 22 Cal.3d 749 [150 Cal.Rptr. 778, 587 P.2d 220].)[6]

Finally, appellant is entitled to a statement of the final decision and reasons therefor in writing. (See *In re Sturm* (1974) 11 Cal.3d 258, 268-270 [113 Cal.Rptr. 361, 521 P.2d 97].) "Fundamental to the concept of procedural due process is the right to a reasoned explanation of government conduct that is contrary to the expectations the government has created by conferring a special status upon an individual. The very essence of arbitrariness is to have one's status redefined by the state without an adequate explanation of its reasons for doing so. . . . [T]he respect for individual autonomy that is at the foundation of procedural due process imposes a distinct obligation upon the government to explain fully its adverse status decision." (Rabin, *Job Security and Due Process: Monitoring Administrative Discretion Through a Reasons Requirement* (1976) 44 U.Chi.L.Rev. 60, 77-78, fns. omitted.)

III

In the present case, appellant received very limited procedural protections. The CRC regulations require that "When a decision is made . . . to recommend exclusion from the Civil Addict Program for nonamenability, the releasee will be given a copy of the exclusion letter prepared for the signature of the regional administrator and informed that he may appeal the recommendation by corresponding directly to the regional administrator within 10 days. The agent will note in his field book that the releasee was given a copy of the letter and informed of his right to appeal. . . ." (Dept. of Corrections Narcotic Addict Outpatient Program Manual, ch. III-21A.)

---

[6]In cases in which disputes over specific factual matters are relevant to the exclusion decision, however, the official responsible for hearing the patient-inmate's case may in his discretion allow the patient-inmate to confront and cross-examine witnesses in the interest of fostering a more accurate decision.

After appellant's arrest, his parole agent visited him in jail and gave him a copy of the exclusion letter she had drafted for signature by the regional administrator. Appellant did not learn of his right to appeal, however, until he received a second letter from his parole agent a week later. Neither letter mentioned the 10-day time limit for the exercise of appellate rights, and the Attorney General does not contend that appellant was otherwise informed of this deadline. The exclusion letter was nevertheless sent to the superior court 10 days after appellant was given a copy of it; the court subsequently excluded him from the CRC. Appellant thus was given less than three days' notice of his right to appeal, and he apparently was not aware of the ten-day requirement. Moreover, nothing in the record discloses that appellant had access to information considered by the Director in making the exclusion decision, nor does it appear that he ever had the opportunity to respond orally before a responsible governmental official. Thus, in light of our preceding discussion, we conclude that appellant was denied due process in the proceedings leading to his exclusion and the resumption of criminal proceedings.

During the pendency of this appeal, appellant has completed service of both the probationary term and the term of imprisonment, and is no longer in custody under the judgments from which he appeals. Thus a remand with directions that he be recommitted to the CRC for a new exclusion hearing would be inappropriate. Nonetheless, because his improper exclusion from the CRC may have denied him a more favorable disposition of the criminal proceedings (Welf. & Inst. Code, § 3200), the order and judgment appealed from cannot stand.

The order granting probation in case No. A-254109 and the judgment in case No. A-419523 are reversed.

Tobriner, J., and Manuel, J., concurred.

NEWMAN, J.—I concur in the reversal of the order and the judgment. Cf. my opinion (conc.) in *People* v. *Arbuckle* (1978) 22 Cal.3d 749, 757 [150 Cal.Rptr. 778, 587 P.2d 220].

RICHARDSON, J.—I concur in the judgment. Because of the close similarity in the applicable United States and California constitutional language, and to avoid insulating our decision from further review, I

would rely on the federal due process clauses, and would apply recent and indistinguishable precedent of the United States Supreme Court. (See *People* v. *Pettingill* (1978) 21 Cal.3d 231, 254 [145 Cal.Rptr. 861, 578 P.2d 108] (dis. opn.); *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 778 [135 Cal.Rptr. 345, 557 P.2d 929] (dis. opn.); *People* v. *Disbrow* (1976) 16 Cal.3d 101, 119 [127 Cal.Rptr. 360, 545 P.2d 272] (dis. opn.).)

When a state creates or recognizes rights and specifies the conditions of their forfeiture, it may not thereafter arbitrarily deny such rights. The state action must be guided by due process considerations. (*Meachum* v. *Fano* (1976) 427 U.S. 215, 225-226 [49 L.Ed.2d 451, 459-460, 96 S.Ct. 2532]; *Wolff* v. *McDonnell* (1974) 418 U.S. 539, 557-558 [41 L.Ed.2d 935, 951-952, 94 S.Ct. 2963]; see *Morrisey* v. *Brewer* (1972) 408 U.S. 471, 479, 482 [33 L.Ed.2d 484, 494-495, 92 S.Ct. 2593].)

Welfare and Institutions Code section 3053 permits exclusion from the benefits of CRC treatment for "excessive criminality or other relevant reason" rendering the patient unfit. As the majority quite properly observes, "the words 'other relevant reason' permit the Director [of the Narcotics Addict Evaluation Authority] broad discretion in making his decision, [but] that discretion is not unlimited." (*Ante,* p. 266.) Procedural rights therefore arise under the federal Constitution. Upon similar facts, the Supreme Court has applied the interest-balancing test carefully described by the majority. (*Wolff, supra,* 418 U.S. at p. 560 [41 L.Ed.2d at p. 953]; *Morrissey, supra,* 408 U.S. at p. 481 [33 L.Ed.2d at p. 494]; see *Cafeteria Workers* v. *McElroy* (1961) 367 U.S. 886, 895 [6 L.Ed.2d 1230, 1236, 81 S.Ct. 1743].)

In my view, these authorities are dispositive, and we need not venture beyond them in deciding the instant case. Nor should we do so; recent Supreme Court decisions demonstrate understandable reluctance to recognize a generalized due process right against "arbitrary" governmental action. (See, e.g., Van Alstyne, *Cracks in "The New Property": Adjudicative Due Process in the Administrative State* (1977) 62 Cornell L.Rev. 445, 455 et seq.)

Clark, J., concurred.

**BIRD, C. J.,** Concurring and Dissenting.—I concur in the lead opinion's discussion of the scope of the due process clauses of the California Constitution and in the conclusion that those constitutional provisions

mandate that an individual committed to the California Rehabilitation Center (CRC) be afforded adequate notice and hearing before being excluded from CRC.[1] However, I cannot agree with that part of the lead opinion which leaves an individual largely defenseless at that hearing. In stripping an individual of his right to present evidence, to call witnesses, and to confront and cross-examine the state's witnesses, this court ignores the requirements of procedural due process.

The lead opinion properly recognizes that a patient-inmate has an "important interest" in the medical and psychological treatment provided by the state at CRC. (Opn. of Mosk, J., *ante,* at p. 272.) According to Department of Corrections documents submitted to this court, treatment is provided in "a minimum security, open-dormitory institution," which maintains "a therapeutic and educational climate." The individual's confinement in CRC is likely to be measured in months, not the years common in state prison sentences.[2] Hence, a decision to exclude an individual from CRC not only eliminates the availability of treatment and counseling but can result in confinement under more severe conditions in a state prison.

Our society has a significant interest in "promoting accuracy and reasonable predictability in governmental decision making . . . ." (Opn. of Mosk, J., *ante,* at p. 267.) Also, due process encompasses a concern for the dignity of the individual subjected to the state's power; part of that concept is the right to participate in a governmental adjudicatory process which significantly affects one's life. (See opn. of Mosk, J., *ante,* at pp. 267, 268.)

In the context of this case, these interests require that adequate notice and hearing be afforded to an individual who may be excluded from CRC. The lead opinion appears to echo that requirement. However, in failing to provide the panoply of rights normally incident to such hearings, the lead opinion ensures that the required notice and hearing formalities will be of little actual utility. Silent as to whether a patient-inmate has the right to present witnesses and documentary

---

[1]It is clear that the procedural rights provided by the lead opinion for an individual subject to exclusion from CRC are *in addition to* the rights mandated in this court's unanimous opinion in *In re Bye* (1974) 12 Cal.3d 96 [115 Cal.Rptr. 382, 524 P.2d 854] for an individual whose outpatient status is being revoked. (See opn. of Mosk, J., *ante,* at p. 270, fn. 2.)

[2]The Superintendent of CRC, in a letter dated January 27, 1978, stated "that the average time that a new resident spends in the institution is eight months." A subsequent letter from the Director of Corrections, dated April 12, 1978, indicated that the "median stay in the institution is now seven months. . . ."

evidence, the opinion specifically denies him any right to cross-examination. The opportunity to ask questions of the state's witnesses is left in the unsupervised discretion of CRC officials. (Opn. of Mosk, J., *ante,* at p. 276, fn. 6.) While proclaiming a concern that procedural protections "be tailored to promote more accurate and reliable adminis-trative decisions" (opn. of Mosk, J., *ante,* at p. 267), the lead opinion denies the patient-inmate the very tools which have been historically sanctioned to achieve that end.

Few rights are more fundamental than the right to present witnesses and documentary evidence in one's own behalf. (See *Wolff* v. *McDonnell* (1974) 418 U.S. 539, 566 and 583 [41 L.Ed.2d 935, 956-957, 966-967, 94 S.Ct. 2963] (conc. and dis. opn. of Marshall, J.); *Chambers* v. *Mississippi* (1973) 410 U.S. 284, 294, 302 [35 L.Ed.2d 297, 308, 312-313, 93 S.Ct. 1038]; *Goldberg* v. *Kelly* (1970) 397 U.S. 254, 267-268 [25 L.Ed.2d 287, 298-299, 90 S.Ct. 1011].) In granting these rights, the state ensures that the decision-maker is forced to consider *all* relevant evidence, even that which by design or oversight might have otherwise been ignored. And if an individual's protestations are seen as self-serving or lacking in credibility, he can present a choir of disinterested, supportive witnesses who can help establish the facts.

Consider the prospects of a CRC patient-inmate subject to exclusion. It would appear that he has little chance of persuading CRC officials to reconsider their decision to exclude him if he cannot present witnesses and documentary evidence to support his contentions. Not only may witnesses be crucial to rebutting the factual foundation for exclusion, but they may bear witness to mitigating factors which justify reconsideration. Clearly, the patient-inmate's entitlement to such rights is both reasonable and unassailable. Yet, the lead opinion is silent as to any countervailing and paramount considerations justifying denial.

The right of cross-examination has been termed " 'the greatest legal engine ever invented for the discovery of truth.' " (*People* v. *Fries* (1979) 24 Cal.3d 222, 231 [155 Cal.Rptr. 194, 594 P.2d 19].) The United States Supreme Court has recently declared that "[c]ross-examination is the principal means by which the believeability of a witness and truth of his testimony are tested." (*Davis* v. *Alaska* (1974) 415 U.S. 308, 316 [39 L.Ed.2d 347, 353, 94 S.Ct. 1105].) As a consequence, "[i]n almost every setting where important decisions turn on questions of fact, due process *requires* an opportunity to confront and cross-examine adverse wit-nesses." (*Goldberg* v. *Kelly, supra,* 397 U.S. at p. 269 [25 L.Ed.2d at

p. 300], italics added. Accord *Chambers* v. *Mississippi, supra,* 410 U.S. at p. 294 [35 L.Ed.2d at p. 308]. Cf. *Pointer* v. *Texas* (1964) 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065].)

Notwithstanding such compelling authority, the lead opinion denies the patient-inmate any right of cross-examination because the decision to exclude is "evaluative in nature." (Opn. by Mosk, J., *ante,* p. 275.)[3] This explanation is unpersuasive. In excluding an individual from CRC, the state must determine whether the individual committed the alleged acts and, in light of his record, whether the conduct warrants his exclusion. The first finding is factual in nature. The fact that discretion is involved in the second finding has never before been the basis for removing procedural rights. Indeed, it is a concern with "minimizing . . . abuses of government discretion . . ." which prompted the lead opinion to adopt an expanded due process analysis. (*Ante,* p. 267.)

In *Morrisey* v. *Brewer* (1972) 408 U.S. 471, 480 [33 L.Ed.2d 484, 493-494, 92 S.Ct. 2593], the United States Supreme Court recognized that the "second step" in the parole revocation process involved decisions about the individual which were "predictive and discretionary," i.e., should parole be revoked in light of the parolee's conduct. In its next term, that court recognized that a probation revocation decision also depended heavily upon a "professional evaluation" of the probationer. (*Gagnon* v. *Scarpelli* (1973) 411 U.S. 778, 784, fn. 8 [36 L.Ed.2d 656, 663, 93 S.Ct. 1756].) A similar professional judgment is required in the decision to revoke the outpatient status of an individual committed to CRC, the process considered by this court in *In re Bye, supra,* 12 Cal.3d 96. Yet, the evaluative nature of the decision in each case was not considered a bar to the right to present evidence and to cross-examine witnesses.

It cannot be denied that significant questions of a purely factual nature are involved in the decision to exclude. In the present case, CRC

---

[3]The lead opinion suggests that permitting cross-examination would also "impair administrative efficiency." (Opn. of Mosk, J., *ante,* p. 276.) Cross-examination is unlikely to be any more disruptive in this context than in any other. Indeed, this court unanimously held that an individual committed to CRC is entitled to cross-examine witnesses at a hearing to review the revocation of CRC outpatient status, in which identical issues and staff would be involved. (*In re Bye, supra,* 12 Cal.3d at p. 110.) In any case, the speculative loss of some efficiency to ensure that the process is administered in a more fair and less arbitrary manner is a comparatively minor cost. As Justice Marshall remarked, "how often do we have to reiterate that the Due Process Clause 'recognizes higher values than speed and efficiency'?" (*Wolff* v. *McDonnell, supra,* 418 U.S. at p. 583 [41 L.Ed.2d at p. 967] (conc. and dis. opn.).)

requested that appellant's commitment to CRC be vacated because of his "excessive criminality with emphasis on violence." They claimed this assertion was supported by a recent conviction for disturbing the peace (Pen. Code, § 415) and a list of arrests. However, it was demonstrated at the hearing in superior court under Welfare and Institutions Code section 3053 that appellant's recent conviction arose out of a domestic dispute, and that he had not been convicted of any violent crime since a conviction for assault 13 years previously. Appellant's aggressive behavior arose largely out of marital problems. The court observed that ". . . at least most of Mr. Ramirez' difficulties stemmed from this long, unhappy marital association." If such allegations can be tested by cross-examination at the exclusion hearing, their significance can be more accurately weighed by CRC personnel.

The lead opinion fails to provide persuasive reasons for denying a patient-inmate the right to present witnesses and documentary evidence and to cross-examine adverse witnesses. Further, in failing to provide these fundamental rights, the lead opinion ignores important case law which has mandated one or both of these rights in analogous contexts as necessary components of due process. (See *Morrisey* v. *Brewer, supra,* 408 U.S. at p. 487 [33 L.Ed.2d at pp. 497-498] [parole revocation]; *Gagnon* v. *Scarpelli, supra,* 411 U.S. at p. 782 [36 L.Ed.2d at pp. 661-662] [probation revocation]; *Wolff* v. *McDonnell, supra,* 418 U.S. at p. 566 [41 L.Ed.2d at pp. 956-957] [prisoner subject to loss of good time credits or solitary confinement]; *Wright* v. *Enomoto* (N.D.Cal. 1976) 462 F.Supp. 397, 403-405, affd. 434 U.S. 1052 [55 L.Ed.2d 756, 98 S.Ct. 1223] [prisoner subject to administrative segregation in maximum security housing]; *In re Bye, supra,* 12 Cal.3d at p. 110 [revocation of CRC outpatient status].) Thus, absent any countervailing considerations, it is clear that a CRC patient-inmate is entitled to call and to cross-examine witnesses at any hearing to exclude that individual from CRC.