Sanchez was not a party to the civil proceeding in which the injunction was granted. He was not served in or given notice of that litigation, and, furthermore, was a minor at the time of that litigation. Subsequently, on August 17, 2010, when Sanchez was 17 years old, Modesto Police Officer *737 Brian Binkley served him with the permanent injunction.[5] Binkley testified about serving Sanchez with a copy of the injunction at a suppression hearing in another misdemeanor criminal contempt case, which was pending against Sanchez at the same time as the instant case and was before the same judge.[6] Binkley testified *148 that he served Sanchez with the injunction on instructions from the SCDA. He testified that Froilan Mariscal gave him "a list of subjects" who were to be "served with the permanent gang injunction." Binkley testified that he served Sanchez with an injunction "packet," which included a copy of the gang injunction, a "list of prohibited actions," and a map of the Safety Zone. Binkley subsequently "turned in" the proof of service paperwork, either to the SCDA or the Modesto Police Department. Binkley testified that he keeps a "list of all of the subjects that have been served with the permanent gang injunction" and is familiar with the boundaries of the Safety Zone. He also said police officers can ascertain whether a specific person has been served with the gang injunction by running a records check through dispatch. Binkley confirmed that Sanchez and his family members lived within the Safety Zone.
Officer Mark Fontes testified at the same hearing regarding service of the injunction packet: "We give [the served persons] a list of the violations, *738 which are 14 of the violations, which they cannot commit while in the Safety Zone. And then there's also a map that outlines the Safety Zone and shows the perimeters of it. Usually I'll go through it or kind of read the violations over with them and let them know that as of that point on, they're not to commit any one of those violations while within these perimeters of the Safety Zone."
B. The Instant Criminal Contempt Action
The complaint initiating the instant case was filed on February 28, 2013. The complaint alleged that Sanchez had violated the gang injunction on January 31, 2013. Evidence regarding the underlying facts was adduced at the preliminary hearing in the matter.[7] On January 31, 2013, at 2:00 p.m., Sanchez was driving on a public roadway within the Safety Zone. Sanchez was stopped by law enforcement because of loud music emanating from his car. When asked whether he was on probation or parole, Sanchez answered in the negative but told the officer he had been served with and subjected to the gang injunction that covered the local area. One of the passengers in the car, a minor, told the officer that he too had been served with the gang injunction. The officer arrested Sanchez and the minor, as both had been served with the gang injunction, and the officer believed that, as a result, they were prohibited from appearing in public together. The officer also arrested them on account of a red jacket he saw in the car (the minor passenger was possibly wearing the red jacket), as the injunction prohibits wearing red clothing.[8] Sanchez was taken to jail and his car was impounded; the minor who was with him in the car was *149 booked into juvenile hall. Subsequently, the instant criminal contempt action was initiated, charging Sanchez with violating the gang injunction by associating with another enjoined person.
Sanchez had advised the arresting officer during the traffic stop that he was not a gang member and should not be subjected to the gang injunction. A gang expert appointed by the court on behalf of Sanchez in this matter also opined in an expert report filed with the court: "Carlos David Sanchez is not a gang member, and furthermore, I believe he has never been a member of *739 the DSSN gang, or any other gang." The gang expert further noted: "Prior to Mr. Sanchez being served with a gang injunction, he had never been arrested. In fact, it appears that the gang injunction, as it applies to Mr. Sanchez, has activated and given him an arrest record that never existed before he was served."[9]
Sanchez moved to dismiss the contempt charge on grounds that the underlying injunction was unconstitutional as applied to him. Specifically, he argued that under the circumstances of this case, he was subjected to the injunction in violation of his right to procedural due process under the federal Constitution. The trial court evaluated Sanchez's procedural due process claim under the Mathews balancing test and concluded that, on the instant record, Sanchez had a due process right to a predeprivation remedy. (See Mathews , supra , 424 U.S. 319, 96 S.Ct. 893.) The court determined that since there was no predeprivation remedy available to Sanchez, the injunction could not be enforced against Sanchez and dismissed the contempt charge.
II. Analysis
A. Constitutionality of the Gang Injunction as Applied to Sanchez
(1) The Applicable Framework for Analyzing the Procedural Due Process Claim and the Trial Court's Analysis Thereunder
Under California's general nuisance statutes ( Code Civ. Proc., § 731 ; Civ. Code, §§ 3479 - 3480 ), a gang and its members can be enjoined from engaging in nuisance activity. ( People ex rel. Gallo v. Acuna, supra, 14 Cal.4th at p. 1119, 60 Cal.Rptr.2d 277, 929 P.2d 596.) California courts are, however, divided on the issue of whether a *740 permanent injunction binds a gang and all its active members when the latter are not individually named and served in the injunction proceeding. (See People ex rel. Totten v. Colonia Chiques (2007) 156 Cal.App.4th 31, 39-43, 67 Cal.Rptr.3d 70 ( Colonia Chiques ) & People ex rel. Reisig v. Broderick Boys (2007) 149 Cal.App.4th 1506, 1522, 59 Cal.Rptr.3d 64 ( Broderick Boys ).) Sanchez, however, does not challenge the process by which the *150 gang injunction was obtained or its applicability to named defendants and active gang members based on technical service requirements. Nor does he challenge the facial validity of any of the provisions of the injunction. Sanchez instead challenges application of the gang injunction to him on procedural due process grounds.
In Rackauckas , supra , 734 F.3d 1025, the Ninth Circuit addressed a similar due process challenge to enforcement of an anti-gang injunction in Orange County. Rackauckas was the first case, state or federal, to address this particular type of due process challenge. Rackauckas , however, considered the due process question in a different context than the instant case, as there a certified class of plaintiffs sought to permanently enjoin the Orange County district attorney from enforcing the anti-gang injunction against them. The Rackauckas plaintiffs were named in the original gang injunction proceeding but, after they appeared in that action, they were voluntarily dismissed by the Orange County district attorney. The Orange County district attorney nonetheless later served the permanent gang injunction on the plaintiffs. Rackauckas explained that dismissal of the plaintiffs from the original injunction proceeding deprived them of an available predeprivation remedy and, prior to being subjected to the injunction, they were not provided with any "alternative adequate process" to determine whether they were covered by the injunction, as was constitutionally required. ( Rackauckas , supra , 734 F.3d at p. 1056 ["some adequate process to determine membership in the covered class is constitutionally required"].) Rackauckas concluded that enforcement of the injunction against the plaintiffs in that case would violate their rights to procedural due process and permanently enjoined its enforcement against them.
Sanchez does not seek permanently to enjoin enforcement of the gang injunction against him or others. Rather, as stated above, he challenges, on procedural due process grounds, its application to him in this specific instance. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning[, in the case of states,] of the Due Process Clause of ... the Fourteenth Amendment." ( Mathews , supra , 424 U.S. at p. 332, 96 S.Ct. 893.) Although the procedural posture of this case is different from that of Rackauckas , the injunctions at issue in both cases are very similar and the due process claims are analogous. Furthermore, while Rackauckas's holding is limited to the circumstances of its plaintiffs-who were initially named as defendants in the *741 original injunction proceeding but, after appearing in the action, were voluntarily dismissed-for purposes of the requisite due process analysis, we see no meaningful distinction between Sanchez's situation and that of the Rackauckas plaintiffs.
As explained in Rackauckas , courts analyze a procedural due process claim under the federal Constitution in two steps, evaluating, in the first step, " 'whether there exists a liberty or property interest which has been interfered with by the State,' " and, in the second, employing the balancing test of Mathews to ascertain " 'whether the procedures attendant upon that deprivation were constitutionally sufficient.' " ( Rackauckas , supra , 734 F.3d at p. 1042, citing United States v. Juvenile Male (9th. Cir. 2012) 670 F.3d 999, 1013 ( Juvenile Male ); see Iraheta v. Superior Court (1999) 70 Cal.App.4th 1500, 83 Cal.Rptr.2d 471 [applying the Mathews framework in determining that named defendants in civil gang injunction proceeding were not entitled to counsel on due process *151 grounds].) In applying the Mathews balancing inquiry in the second step of the due process analysis, courts consider: (1) "the private interest that will be affected by the official action"; (2) "the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." ( Mathews , supra , 424 U.S. at p. 337, 96 S.Ct. 893.)
In conducting the requisite two-step analysis, Rackauckas determined, at the first step, that the gang injunction at issue in that case "profoundly implicate[d] liberty interests protected by the Due Process Clause, including rights of free movement, association, and speech," and that the enforcement of that injunction by the Orange County district attorney's office "interfere[d] with those protected liberty interests." ( Rackauckas , supra , 734 F.3d at p. 1042.) In the second step of the due process analysis, Rackauckas applied the three-factor balancing test explicated in Mathews to examine " 'whether the procedures attendant upon [Orange's] deprivation' of Plaintiffs' liberty interests 'were constitutionally sufficient.' " ( Rackauckas , supra , 734 F.3d at p. 1044.) Rackauckas found that "[a]ll the Mathews factors, taken together, weigh[ed] decisively in favor of Plaintiffs," and determined that "the district court correctly concluded that Orange violated Plaintiffs' rights under the Due Process Clause of the federal Constitution." ( Rackauckas , supra , 734 F.3d at p. 1053.) Rackauckas therefore affirmed "the district's court issuance of declaratory and injunctive relief in Plaintiffs' favor." ( Rackauckas , supra , 734 F.3d at p. 1053.)
In the instant matter, in considering Sanchez's motion to dismiss (along with similar motions in other criminal contempt cases related to the injunction), the trial court noted: "My concern is the due process issue as to who *742 can decide whether or not someone can be arrested for a gang injunction and be booked into jail, stay in jail, or post bail." Thus, the question for the court to resolve was whether due process required that Sanchez have access to some kind of predeprivation process to determine whether he was an active DSSN gang member for purposes of the injunction. The court explained that prior California cases dealing with gang injunctions "did not involve due process challenges" akin to the one presented here, but Rackauckas was on point. Specifically, the court stated, "it's pretty clear that these cases, with respect to the gang injunction, are on all fours with Rackauckas with the exception there was no file and dismiss strategy involved with these defendants. The due process argument[s] with that difference in procedural posture are, in fact, the same that are raised here."
The trial court conducted the two-step due process analysis outlined in Rackauckas to assess whether subjecting Sanchez to the injunction violated procedural due process. The court initially found that, given the broad scope of the injunction, the state had interfered with protected liberty interests, triggering due process scrutiny. The court then conducted the Mathews inquiry to determine whether the existing procedure utilized by the SCDA in enforcing the injunction was constitutionally sufficient. In conducting its analysis, the court observed:
"And I don't have any doubt that the [district attorney] and law enforcement have a strong and important interest in controlling gangs in this particular neighborhood. Obviously, this neighborhood in particular has been placed in a *152 strangle hold based on the activities of various gangs.
"My concern is that-this dawned on me as I was driving home the last day after the court hearing, and I left from work, I made a stop somewhere, and had I been subject to the gang injunction and lived in that area, then I could have been stopped for doing an activity that all of us do as a part of our daily lives. There's curfew violations, there's, you know, someone comes back late from a family wedding; someone goes to their younger brother's football game at Downey High School, comes home after the curfew, and this covers a large activity-a large number of activities in a large geographical area. It is permanent, and I'm-frankly, getting arrested and going to trial is an insufficient due process remedy.
"And as indicated in Rackauckas , determining whether someone is a gang member is not a simple task. Someone can be out with someone else based on a familial relationship or friends from the neighborhood that may not be gang related. In fact, two of the defendants here are, in fact, cousins subject to this injunction since they [were] both ... served a copy of the order."
*743 The court specifically asked the prosecutor to address the government's interest, if any, in failing to provide a predeprivation remedy, commenting that the third Mathews factor "is probably the closest argument that can be made." The court noted that Stanislaus County undoubtedly had a significant interest in combatting gang violence, but emphasized that "[t]he question is whether the government has a significant interest in failing to provide a pre-deprivation process where someone can challenge the determination of active gang membership." The prosecutor was unable to identify any governmental interest in failing to provide such a predeprivation remedy. The prosecutor did not suggest, for instance, that provision of a predeprivation hearing would be unduly burdensome or infeasible.
The court then laid out its concerns: "Bad facts obviously affect changes in the law.... [H]ere we have an injunction that covers a large geographic area that covers a lot of activity that we all take for granted, and there is no procedural ... way the defendants can challenge whether or not they should have been subject to this gang injunction since it's permanent [and] any appeal period or any right to intervene [in the original injunction proceeding] would have long passed." The court ultimately determined that the Mathews factors weighed in favor of the conclusion that the SCDA had violated due process by failing to provide some kind of predeprivation remedy to Sanchez. As discussed below, on the instant record, we agree with the trial court.[10]
(2) Step One in the Due Process Analysis: Whether there Exists a Liberty or Property Interest which has Been Interfered With by the State?
The instant gang injunction applies to the Safety Zone, a 1.89 square mile area *153 comprising five percent of the City of Modesto. The Safety Zone includes residential neighborhoods in South Modesto; indeed Sanchez lives and has grown up within the Safety Zone. The injunction is very similar to, and appears to be modeled on, the injunction at issue in Rackauckas , which the Rackauckas court found "profoundly implicat[ed] liberty interests protected by the Due Process Clause, including rights of free movement, association, and speech." ( Rackauckas , supra , 734 F.3d at p. 1042 [noting that the injunction pertinent to that case "places a heavy burden" on the exercise of a *744 range of constitutionally-protected liberty interests within the ambit of the First Amendment, which have "always been viewed as fundamental components of the liberty safeguarded by the Due Process Clause"].) Just like the gang injunction at issue in Rackauckas , the instant injunction implicates, on its face, constitutionally-protected liberty interests and fundamental rights, including the rights of association, free movement, and free speech.[11]
For example, the "Do Not Associate" provision prohibits anyone subject to the injunction from associating with any other enjoined parties-including family members-"anywhere in public view or [in] any place accessible to the public." This provision extends to "[s]tanding, sitting, walking, driving, gathering or appearing." In addition, the injunction establishes curfews for both minors and adults, prohibiting nighttime presence in any "public place" except for "work, school or an emergency." The injunction also proscribes enjoined persons from possessing alcohol in public view or a public place and from "approaching ... any vehicle on any street," when walking. As Rackauckas explains, "[t]hese provisions directly interfere with an individual's 'fundamental right of free movement,' " and "an 'individual's decision to remain in a public place of his choice.' " ( Rackauckas , 734 F.3d at p. 1042.)
Other provisions of the injunction further restrict freedom of movement and use of public places because of the actions of others, over which one may have no control, and do so without regard to whether the other person is an enjoined gang member. For example, the "Stay Away From Alcohol" provision prohibits an enjoined party from "knowingly remaining in the presence of anyone possessing an open container of an alcoholic beverage" and "knowingly remaining in the presence of an open container of an alcoholic beverage," "[a]nywhere in public view or any place accessible to the public." Similarly, the "No Guns or Dangerous Weapons" provision prohibits "knowingly remaining in the presence of anyone who is in possession" of "any gun, ammunition, illegal weapon" or "replica or imitation weapon," and "knowingly remaining in the presence of such gun, ammunition, or dangerous weapon," "[a]nywhere in public view or any place accessible to the public."[12] The "Stay Away From Drugs" provision also proscribes "knowingly remaining in the presence of anyone selling, possessing, or using any controlled substance or ... related paraphernalia" and "knowingly remaining in the presence of any controlled substance or ... related paraphernalia."
*745 The "Do Not Associate" provision and other limitations on association have no exceptions to permit individuals to engage *154 in constitutionally-protected expressive activities for political, social, and economic ends. ( Rackauckas , 734 F.3d at p. 1043.) The "Do Not Associate" prohibition also burdens the constitutionally-protected freedom of "intimate association" by barring association with family members (who are also enjoined by the injunction) in public places such as streets and highways, restaurants, workplaces, and shops, but also at home if "in public view." ( Rackauckas , 734 F.3d at p. 1043.) Finally, the prohibition on wearing red clothing and "anything with the words 'Deep South Side' " possibly restricts freedom of expression, and the prohibition against "talking to the occupants of ... any vehicle on any street" restricts freedom of speech. (See Rackauckas , 734 F.3d at p. 1043.)
On the basis of the injunction's terms alone, its application clearly burdens and interferes with constitutionally protected liberty interests, especially as to persons like Sanchez, who live within the Safety Zone and whose families historically have lived within the Safety Zone. However, in addition to the injunction's restrictive terms, the manner of enforcement of the injunction constitutes further interference with liberty interests, triggering due process scrutiny. The record shows that law enforcement authorities in Modesto track persons served with the injunction by running records checks. It indicates that persons suspected of violating the injunction on the basis of otherwise lawful conduct are not merely cited and released; rather they are arrested, booked into jail, and prosecuted for criminal contempt of the injunction. In the instant case, Sanchez was the subject of a traffic stop. Law enforcement officers arrested and took into custody Sanchez and his minor passenger because they were both subject to the injunction and were together in the Safety Zone, allegedly in violation of the "Do Not Associate" provision of the injunction; Sanchez's car was also impounded.
Here, the SCDA's curtailment of Sanchez's constitutionally-protected liberty interests by deeming him a covered gang member and subjecting him to the injunction, constituted governmental interference, triggering due process scrutiny. ( Rackauckas , supra , 734 F.3d at p. 1044.) We must therefore examine whether SCDA was required to provide additional procedural protections, beyond its existing unilateral process, before subjecting Sanchez to the injunction.
(3) Step Two in the Due Process Analysis: the Mathews Balancing Inquiry
As stated above, in the second step of the due process inquiry, we apply the balancing framework outlined in Mathews , supra , 424 U.S. 319, 96 S.Ct. 893 to assess *746 whether the procedures attendant upon the deprivation of Sanchez's liberty interests were " ' "constitutionally sufficient." ' " ( Juvenile Male , supra , 670 F.3d at p. 1013.) As previously noted, Mathews sets forth a three-factor test for evaluating the sufficiency of existing procedures, directing us to examine:
"[F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." ( Mathews , supra , 424 U.S. at p. 335, 96 S.Ct. 893.)
In applying the Mathews balancing test, we recognize that " 'the requirements of due process are "flexible and call *155 for such procedural protections as the particular situation demands." ' " ( Rackauckas , supra , 734 F.3d at p. 1044 ; Today's Fresh Start, Inc. v. Los Angeles County Office of Educ. (2013) 57 Cal.4th 197, 212, 159 Cal.Rptr.3d 358, 303 P.3d 1140 ( Today's Fresh Start ) [the precise dictates of due process are flexible and vary according to context].) " 'The function of legal process, as that concept is embodied in the Constitution, and in the realm of factfinding, is to minimize the risk of erroneous decisions . Because of the broad spectrum of concerns to which the term must apply, flexibility is necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error.' " ( Heller v. Doe (1993) 509 U.S. 312, 332, 113 S.Ct. 2637, 125 L.Ed.2d 257 (italics added).) The governmental decision at issue here is the SCDA's decision to subject Sanchez to the injunction based on its internal determination that he is a covered gang member.
(a) The private liberty interest affected by the injunction
As reflected in our earlier analysis of the liberty interests curtailed by the injunction, the private interest at issue here is notably strong. While the injunction prohibits a range of unlawful and undesirable conduct, it sweeps more widely than simply restricting gang-related activities. Indeed, it restricts basic liberties and rights of the individuals subjected to it, interfering with their ability to engage in common, day-to-day, lawful activities. The injunction is particularly onerous on someone like Sanchez, who lives in the affected area, along with members of his family. The burden on the private liberty interests is compounded by the fact that the injunction has no expiration or sunset date and is permanent, extending the deprivation in perpetuity. (See Mathews , supra , 424 U.S. at p. 341, 96 S.Ct. 893 [the possible length of the wrongful deprivation is an important factor in assessing the impact of official action on private interests].) Furthermore, there is no evidence that *747 SCDA had in place a systematic review mechanism or removal procedure, whereby a person subjected to the injunction may subsequently be removed from its purview.[13] In sum, as Rackauckas found in evaluating the similar restrictions imposed by the injunction at issue there, the private interests affected by the injunction are "truly weighty." ( Rackauckas , supra , 734 F.3d at p. 1045.)
(b) The risk of erroneous deprivation and the probable value of additional safeguards
Here, after obtaining the gang injunction by default against the Deep South Side Norteños gang and 12 named defendants, the SCDA began to serve the injunction *156 on individuals who were not named or served as defendants in the original injunction proceeding, but rather were subsequently alleged to be active members of the Deep South Side Norteños (DSSN) gang by the SCDA. Although actual members of the DSSN can properly be bound by the injunction, due process concerns arise when the manner in which the SCDA decides who is an actual member of the DSSN itself creates a high risk of erroneous determinations.
More specifically, in the context of the instant injunction, individuals who were properly served in the original injunction proceeding clearly had notice of the proceeding and the opportunity to be heard on the question of whether they were covered gang members; accordingly, any due process concerns regarding enforcement of the injunction against them are alleviated. However, enforcement of the injunction against someone like Sanchez, who was not served in the original injunction proceeding and who, furthermore, was a minor at the time the injunction was granted, raises significant due process concerns in light of the important liberty interests at stake along with potential for error in the procedures used to identify additional, covered gang members.
The People have represented that the SCDA served the injunction on individuals it determined were "active" gang members or participants of the *748 DSSN. "[F]or the purposes of a gang abatement injunction," "an active gang member is a person who participates in or acts in concert with" a gang, such that "[t]he participation ... [is] more than nominal, passive, inactive or purely technical." ( People v. Englebrecht (2001) 88 Cal.App.4th 1236, 1258, 1261, 106 Cal.Rptr.2d 738 ( Englebrecht ); see Broderick Boys , supra , 149 Cal.App.4th at p. 1517, 59 Cal.Rptr.3d 64.) Furthermore, for purposes of inclusion in a civil gang injunction, the People have the burden of demonstrating active gang membership by "clear and convincing evidence" rather than a lower "preponderance" standard, in view of "the importance of the interests affected" by such an injunction. ( Englebrecht , 88 Cal.App.4th at p. 1256, 106 Cal.Rptr.2d 738.)
For his part, Sanchez has maintained that he is not a covered gang member. Sanchez told the officer who arrested him in the incident underlying this case that he was not a gang member and should not be subjected to the injunction. A gang expert appointed by the trial court on behalf of Sanchez also opined in an expert report filed in the trial court that Sanchez was not a gang member. The record indicates that Sanchez had no criminal or arrest record prior to enforcement of the injunction against him, which has led to arrest and prosecution for criminal contempt in multiple cases. Nor is there any allegation or evidence that Sanchez has ever been judicially determined to be an active DSSN gang member for any purpose.
Under the second Mathews factor, we consider the nature of the inquiry as to whether an individual is an active gang member or participant; the adequacy of the procedures used to make this determination by the SCDA; the value of additional procedural safeguards; and the sufficiency of postdeprivation remedies. ( Mathews , supra , 424 U.S. at p. 335, 96 S.Ct. 893 ; Rackauckas , supra , 734 F.3d at p. 1045.)
Our analysis under the second Mathews factor is set forth in detail below. We have considered the fact that determining whether an individual is an active gang participant for purposes of enforcement of a gang injunction is a complex endeavor. As counsel for the People acknowledged at oral argument, the determination is nonetheless left to one gang investigator within the SCDA, Froilan Mariscal, who "authored"
*157 the gang injunction and serves as the "injunction manager." Furthermore, the SCDA has yet to clarify how Mariscal made the initial determination that Sanchez was a covered gang participant, leading to service of the injunction on him.[14] In addition, there is *749 no process for an affected individual in Sanchez's position to challenge the SCDA's conclusion, prior to being arrested and prosecuted for allegedly violating the injunction. This situation creates a substantial risk of erroneous deprivation but the risk would be substantially mitigated by provision of additional procedural protections. As discussed below, based on these considerations, we conclude that the second Mathews factor weighs in Sanchez's favor.
(i) Nature of the Gang Membership Inquiry
Courts have recognized that the inquiry as to whether an individual is an active gang member is a fact-intensive one, whereby "determining whether someone is involved and the level of involvement is not a simple matter." ( People v. Valdez (1997) 58 Cal.App.4th 494, 506-507, 68 Cal.Rptr.2d 135 ( Valdez ).) As Valdez explained, "gangs are not public and open organizations or associations like the YMCA or State Bar Association, which have a clearly defined and ascertainable membership. Rather, gangs are more secretive, loosely defined associations of people, whose involvement runs the gamut from 'wannabes' to leaders." ( Id. at p. 507, 68 Cal.Rptr.2d 135.) In addition, as Colonia Chiques noted with regard to the fluid nature of the gang there, gang membership is not static but, rather, is "continually changing," in that "[n]ew members are joining the gang, while old members are leaving it or becoming inactive." ( Colonia Chiques, supra, 156 Cal.App.4th at p. 41, 67 Cal.Rptr.3d 70 ; see Rackauckas , supra , 734 F.3d at p. 1046, fn. 21 [describing gang membership as "fluid and often fleeting," and noting that "[m]ost juveniles belong to gangs for '1 year or less' "].) The STEP Act's definition of "criminal street gang" also encompasses groups "whether formal or informal," signifying that gangs often are loosely structured. (§ 186.22, subd. (f).)
Since gangs lack formalities that might provide objective and verifiable means of establishing membership, such as dues-paying lists, it is not usually possible to confirm gang membership with reference to objective criteria. Indeed, in closely and thoroughly considering the issue, Rackauckas concluded: "Determining whether an individual is an active gang member presents a considerable risk of error. The informal structure of gangs, the often fleeting nature of gang membership, and the lack of objective criteria in making the assessment all heighten the need for careful factfinding." ( Rackauckas , supra , 734 F.3d at p. 1046.) Given the nature of the *158 inquiry *750 required to confirm gang membership, the risk of error is particularly great when the determination is made without any participation by, or opportunity to provide evidence on behalf of, the individual served with the injunction, as was the case here.
(ii) The Adequacy of the Procedures Utilized by the SCDA and the Value of Additional Safeguards
Documentation submitted by the People reveals that Froilan Mariscal, a gang investigator in the SCDA-who "authored" the gang injunction and is the "injunction manager"-was tasked with identifying the individuals to be served with the gang injunction. In the original injunction proceeding in 2009, Mariscal averred in a declaration that the DSSN gang had around 50 active members. By 2012, 105 individuals had been served with the injunction based on Mariscal's determination that they were active participants in the DSSN.[15]
The People represented in the trial court that the determinations were made with reference to a range of criteria that were applied on a case-by-case basis, with reference to evidence gleaned from "field interviews, field contacts, police reports, law enforcement databases, and admissions, etc.," as well as from informants. Determinations were based on factors "such as": "jail/juvenile hall classification," "identification by reliable sources," "associations with gang members," "use of hand signs, symbols, words or phrases associated with the gang," "possession of gang tattoos," "self-admissions of gang membership," "involvement in activities consistent with gang activities," "physical evidence of gang association, i.e., gang rosters, drawings, photographs, bandanas, symbols," and "judicial finding of gang membership or participation."
Many of the factors considered-e.g., clothing, associations, information from informants-were not objective (in the sense of a dues-paying membership list, board-approved membership regulations, and similar bright-line methods of making a determination of group membership). On the contrary, as apparent from most of the factors and the types of documentation that were relevant to the determination, the process entailed assessing and weighing evidence to make factual determinations, including by making subjective judgments and credibility determinations. Despite the nuanced nature of the inquiry, here the SCDA unilaterally decided who would be subjected to the injunction's restrictions, without providing notice, access to evidence, or an *751 opportunity to be heard to the affected persons. Consequently, the SCDA's determination as to whether an individual was an active gang member entailed a considerable risk of error.
A close look at some of the factors that were relevant to the determination of gang membership reveals that the process used by the SCDA was neither objective nor particularly reliable. Take for instance the "associating with gang members" criterion. Sanchez's gang expert explained in his expert report filed in the trial court that this factor is difficult to apply in practice because a person's familial and social relationships can be misperceived as gang-related relationships and result in misidentification of that person as an active gang member. Sanchez, for example, was served with the gang injunction along with his *159 brother and at least one of his cousins, raising the possibility, to the extent association with family members was a factor in deeming Sanchez a gang member, that these associations were not necessarily gang related.
Similarly, factors such as "jail/juvenile hall classifications," "use of hand signs, symbols, words or phrases associated with the gang," "wearing of gang attire or colors," and "possession of gang tattoos," do not necessarily and conclusively correlate to "active gang membership." Sanchez's gang expert noted that, in some instances, these factors signify neighborhood affiliation or loyalty to family members rather than active gang participation. In the present context, for example, Deep South Side Modesto, one of the names of the gang enjoined by the injunction, is also the name of the neighborhood encompassed by the Safety Zone, and affiliation with one can be mistaken for affiliation with the other, as Sanchez's gang expert noted. Prior admissions of gang membership are also of variable evidentiary significance depending on the context and circumstances in which they were made. Such admissions, at times, connote merely a passive, nominal, or familial affiliation, and may be motivated by a need for protection because of neighborhood- or family-based affiliations. (See Vasquez v. Rackauckas (C.D. Cal. 2011) 203 F.Supp.3d 1061, 1071, overruled on other grounds in Rackauckas , supra , 734 F.3d 1025.)
In addition, as Rackauckas explained, "the fact that the police observe an individual violate one of the [gang injunction's] terms is of little probative value in assessing whether that individual is in fact [a] ... gang member. The [injunction] prohibits a wide variety of otherwise legal, quotidian conduct not directly correlated with the nuisance and criminal activities that gave rise to the [injunction]. Much of the behavior covered by the [injunction] can occur outside the presence of any other individual even putatively covered by the [injunction]." ( Rackauckas , supra , 734 F.3d at p. 1047.)
*752 Although determining whether a particular individual is actively "involved [in the gang] and the level of involvement is not a simple matter," here the determination was made unilaterally by the SCDA, or, more accurately, by a single gang investigator within the SCDA, without providing notice and an opportunity to be heard to the affected individual. ( Rackauckas , supra , 734 F.3d at p. 1046 ; Valdez , supra , 58 Cal.App.4th at pp. 506-507, 68 Cal.Rptr.2d 135.) As the SCDA alone made the determination that an individual could properly be subjected to the injunction's wide-ranging restrictions, the determination was rendered opaque and unreviewable at precisely the same time that the threshold for prosecution of that person was drastically lowered by virtue of approval of the injunction itself. (See Englebrecht , supra , 88 Cal.App.4th at pp. 1255-1256, 106 Cal.Rptr.2d 738 [noting that because a gang injunction restricts lawful, commonplace activity, it is an extraordinary remedy]; also see Am.-Arab Anti-Discrimination Comm. v. Reno (9th Cir. 1995) 70 F.3d 1045, 1069 (quoting Joint Anti-Fascist Refugee Comm. v. McGrath (1951) 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (Frankfurter, J. concurring)) [" 'fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights' "].)
In Sanchez's case, the People have yet to specify the precise process-including all the factors considered and any evidence that was disregarded-by which he was deemed an active participant in the DSSN, prior to service of the injunction on him on August 17, 2010. We conclude the one-sided procedures used by the SCDA to *160 identify purported active gang participants encompass a significant risk of error. In light of the nature of the inquiry at issue, additional procedural protections that characterize due process, including notice and an opportunity to be heard, would be of considerable value in mitigating the risk of error.
(iii) Sufficiency of Postdeprivation Remedies
In some instances, postdeprivation remedies may cure what would otherwise be an unconstitutional deprivation of protected interests.[16] In the trial court, the People contended that a jury trial at the culmination of criminal contempt proceedings was an adequate postdeprivation remedy that would cure any violation of procedural due process in subjecting Sanchez to the injunction. We cannot agree.
*753 Officer Binkley testified that when the injunction was served on a person, the latter was provided with a map of the Safety Zone and a list specifying the activities and conduct he or she was prohibited from engaging in. As discussed above, the injunction sweeps broadly, prohibiting a range of basic liberties and everyday, lawful conduct. Further, the trial court noted, individuals alleged to have violated the injunction are "booked into jail" and either "stay in jail, or post bail," pending trial. In other words, a person who is served with the injunction must either comply with its restrictions or risk arrest. As for Sanchez, as long as he remains subject to the injunction, he remains at risk of arrest for violations of its terms, including the curfew provision and the restrictions on association and presence in public places. Furthermore, even were he to proceed to trial in this matter and prevail, he would nonetheless remain subject to the injunction in perpetuity, and, in turn, to arrest for additional violations of its provisions. Given this scenario, jury trial in the instant contempt proceeding would not provide "full relief" from the deprivation effected by subjecting him to the injunction. (See Mathews , supra , 424 U.S. at p. 331, 96 S.Ct. 893 ; also see Rackauckas , supra , 734 F.3d at p. 1051.)
Rackauckas's analysis of the difference between a gang injunction and other, more narrowly focused injunctions is also instructive in this context. Rackauckas explained that while postarrest contempt proceedings might potentially constitute a sufficient postdeprivation remedy in relation to certain types of injunctions, they are not an adequate postdeprivation remedy for a gang injunction which imposes wide-ranging restrictions and creates a risk of arrest. With respect to the gang injunction there, Rackauckas explained:
"[The gang injunction] proscribes a broad range of basic, daily activities by [the gang's] members, and it proscribes such conduct without regard to whether the individual is engaged in that conduct in concert with, as a member or agent of, or with the intent to further the purposes of the gang.
"In these respects, this case differs from other contexts in which an injunction runs against an organization and its members, and, we shall assume for present *161 purposes, unnamed members are accorded sufficient process through the opportunity to defend criminal contempt accusations. The abortion and labor cases, for example, involve injunctions restricting a narrow range of conduct-e.g., demonstrating in a certain location or with a certain object. Engaging in those activities is likely to be highly correlated with whether an individual is in fact a member of the enjoined organization, which had engaged in similar activities. In contrast, the [gang injunction] prohibits an enormous range of quotidian conduct that, on its face, is not indicative of an individual's gang membership, or any other connection to the enjoined gang. *754 "Moreover, the difference in the scope of the injunctions in these various contexts is relevant because '[t]he more important the interest' affected by state action, 'and the greater the effect of the impairment, the greater the procedural safeguards the state must provide to satisfy due process.' [Citation.] Further, the lack of an inherent correlation between the enjoined activities and membership in the group covered by the [gang injunction] exacerbates the already significant risk of error in identifying accurately the members of [the gang]." ( Rackauckas , supra , 734 F.3d at p. 1052.)
We conclude that, in light of the injunction's undeniable interference with protected liberty interests and the lack of adequate predeprivation procedural safeguards, a jury trial in contempt proceedings such as the instant one is insufficient to cure the deprivation of liberty, including jail time, to which Sanchez has been subject since being served with the injunction in 2010. (See Rackauckas , supra , 734 F.3d at p. 1052.)
In sum, the second Mathews factor-the risk of erroneous deprivation and the probable value of additional safeguards-weighs in Sanchez's favor.
(c) The government's interest in failing to provide a predeprivation remedy
Turning to the final prong of the Mathews analysis, we consider "the Government's interest" in providing (or not providing) specific procedures, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (See Mathews , supra , 424 U.S. at p. 335, 96 S.Ct. 893.) Here, the trial court stated, "I don't have any doubt that the [district attorney] and law enforcement have a strong and important interest in controlling gangs in this particular neighborhood." We agree with the trial court that combatting gang violence is a critically important law enforcement goal. However, as the trial court correctly noted, the relevant inquiry under Mathews is whether the state has a significant interest in failing to provide a predeprivation process through which an individual can challenge the SCDA's determination that he or she is an active gang member subject to the injunction. (See Rackauckas , supra , 734 F.3d at p. 1052.)
The People do not argue that providing a predeprivation remedy to individuals who were not named and served in the original injunction proceeding is administratively or fiscally unfeasible. Nor did the People present any arguments or evidence to the trial court regarding the existence of a significant government interest in failing to provide a predeprivation remedy in connection with enforcement of the injunction.
*755 In Rackauckas , the court concluded that the relevant government agencies there *162 had not established a government interest in failing to provide procedural safeguards for the persons who were challenging application of the gang injunction in that case; specifically, the agencies "presented no evidence of " 'an administrative, fiscal or other substantial burden[ ] in providing ... pre-deprivation safeguards." ( Rackauckas , supra , 734 F.3d at p. 1053, italics omitted.) Rackauckas pointed out that the same government agencies had avoided due process problems in the enforcement of other gang injunctions by "nam[ing] each defendant individually in the initial filing." ( Id. at p. 1052.) Rackauckas further explained that, "at least two jurisdictions in California-San Francisco and Oakland-regularly provide some form of pre-deprivation process for individuals in anti-gang injunction proceedings, rather than simply seeking injunctions against the gang as an entity and its unnamed members."[17] ( Id . at p. 1053.)
Although, like Rackauckas , we are not deciding the constitutionality of predeprivation mechanisms used in connection with other gang injunctions, it is clear that other jurisdictions have fashioned mechanisms under which a gang injunction can effectively be enforced by constitutional means. We conclude the final Mathews factor-like the first two factors-also weighs decisively in favor of Sanchez.
(4) Conclusion
The record here demonstrates: (1) the scope of the injunction is notably broad, whereby it interferes with a wide range of protected liberty interests; (2) Sanchez was not named and served in the original injunction proceeding and, indeed, was a minor at the time; (3) Sanchez has repeatedly asserted he is not a gang member and his court-appointed expert has come to the same conclusion; (4) the procedure used to make the determination of gang membership encompasses a significant risk of error; (5) the People have not specified the basis on which Sanchez was determined to be a covered gang member (including any evidence that was disregarded in making the determination), leading to service of the injunction on him; (6) additional procedural safeguards such as notice and an opportunity to be heard would be of considerable value; (7) in light of the important liberty interests at stake, the right to a jury trial in a criminal contempt action premised on a violation of the injunction is insufficient to provide a person in Sanchez's position with *756 full relief; and (8) the People have not articulated, let alone demonstrated, any government interest justifying the failure to provide any procedural safeguards before subjecting individuals to the injunction. On this record, we conclude that, under the Mathews balancing inquiry, provision of some predeprivation process was required before the gang injunction could be applied to Sanchez consistent with his right to procedural due process under the federal Constitution. Here, Sanchez's procedural due process rights were violated.
Furthermore, in examining when procedural safeguards are required under the California Constitution, we similarly apply the Mathews balancing inquiry with the addition of a fourth factor: the *163 dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible government official. ( People v. Ramirez (1979) 25 Cal.3d 260, 268, 158 Cal.Rptr. 316, 599 P.2d 622 ; Ryan v. California Interscholastic Federation (2001) 94 Cal.App.4th 1048, 1071-1072, 114 Cal.Rptr.2d 798.) This dignitary interest encompasses the appearance of fairness to those involved. (See People v. Hernandez (1984) 160 Cal.App.3d 725, 747-748, 206 Cal.Rptr. 843.) The California Constitution ultimately provides more due process protection than the federal Constitution alone. ( Today's Fresh Start , supra , 57 Cal.4th at pp. 213-214, 159 Cal.Rptr.3d 358, 303 P.3d 1140.) Here, Sanchez had no notice or opportunity to be heard before he was subjected to an injunction with profound consequences for daily life, including family relationships, freedom of movement, and civic participation in the neighborhood in which he lives. The appearance-of-fairness factor under the California Constitution supports our conclusion that applying the injunction against Sanchez violated procedural due process.
We emphasize that Sanchez has not challenged the substantive terms of the injunction and our decision is not intended to, nor does it serve to undermine enforcement of the injunction against properly covered individuals. Gang injunctions are prophylactic measures that restrict the lawful, daily activities of covered individuals in an effort to prevent illegal activities from taking place. ( Rackauckas , supra, 734 F.3d at p. 1056.) While we recognize the importance of preventing illegal activities by gang members, here the breadth of the injunction implicates important liberty interests and Sanchez was entitled to some constitutionally adequate process to determine his membership in the group covered by the injunction.[18]
Finally, we note that at oral argument, counsel for the People indicated that while this appeal was pending, the SCDA independently modified, on its own *757 initiative, its procedures related to enforcement of the injunction, evidently to alleviate procedural due process concerns. We express no opinion on the constitutionality of these new procedures as their substance is beyond the scope of the present record and their constitutional sufficiency is not at issue in this matter.
B. Dismissal of the Contempt Charge
Here the trial court correctly determined that the injunction could not be applied to Sanchez consistent with the federal Constitution unless Sanchez had access to a predeprivation remedy. Therefore, service of the permanent injunction on Sanchez had no effect and Sanchez could not be guilty of criminal contempt for violating its provisions. The trial court therefore properly dismissed the criminal contempt charge.[19]
DISPOSITION
The judgment is affirmed.
WE CONCUR:
*164 HILL, P.J.
POOCHIGIAN, J.

Sanchez's date of birth is April 23, 1993.

We take judicial notice of the transcript of that suppression hearing in Stanislaus County Superior Court case No. 1450035, held on June 16, 2014, before Judge Ricardo Cordova, who also presided over the instant case. (See Evid. Code, §§ 452, 459.) At the June 16, 2014 hearing, Binkley described the incident underlying the contempt charges in that case. Binkley testified that on August 31, 2012, at around 11:22 p.m., he and his partner were driving in the Safety Zone when they saw a car go by in the opposite direction. They caught up to the car at a stop sign. Binkley's partner got out and shone a spotlight into the car, whereupon the officers saw Sanchez in the front passenger seat. Binkley recognized Sanchez, as Binkley had served him with the gang injunction. Thereupon, the officers initiated a traffic stop on grounds that Sanchez was in violation of the injunction's curfew provision. After initiating the traffic stop, the officers saw Sanchez's cousin, Francisco Vasquez, in the car as well, and Binkley recalled that Vasquez had also been served with the injunction (Binkley's partner testified that he had in fact served Vasquez with the injunction when Vasquez was a minor). The officers arrested Sanchez for violating the curfew provision of the injunction and for associating with another enjoined person (i.e., his cousin), leading to Sanchez's prosecution for criminal contempt of the injunction.
At the suppression hearing, the trial court was concerned that the police lacked probable cause to make the underlying traffic stop in the first instance, because the curfew provision of the gang injunction contains exceptions for work and school. The prosecutor argued: "This case, the officers were in the Safety Zone, observed the vehicle, stopped the vehicle [,] ... [i]mmediately spotlighting the vehicle, recognized a person that they knew to be on the gang injunction that they knew to be [within] the Safety Zone, [therefore] they had probable cause to stop the vehicle." The trial court disagreed because "the officer did not have any basis to determine that [Sanchez was] not subject to the exception of the gang curfew of being out past 10:00 PM." The trial court granted Sanchez's motion to suppress evidence regarding contempt charges stemming from that particular traffic stop.

Since Sanchez was also charged with felony cannabis possession in this matter, the court held a preliminary hearing; the felony charge was later reduced to a misdemeanor under Proposition 47.

The officer also found what was later determined to be 0.66 grams of concentrated cannabis in the trunk of the car. The officer conducted a "DUI evaluation" on Sanchez but determined that Sanchez was not under the influence at the time. Sanchez subsequently moved for dismissal of the misdemeanor cannabis possession charge resulting from the discovery of the 0.66 grams of concentrated cannabis on grounds that he was a qualified medicinal cannabis patient with a valid physician's recommendation for the use of medicinal cannabis. The trial court denied the motion on grounds that the question whether Sanchez was a "medical marijuana patient" was "an issue of fact that would [properly] be resolved at trial."

In addition to case No. 1450035 (discussed above), in which Sanchez was charged with violating the injunction by appearing in public with his cousin, Sanchez was evidently charged in seven other cases for various alleged violations of the injunction. In case No. 1468072, for example, Sanchez was stopped by police while driving home from church with his brother, Sergio Sanchez (who had also been served with the injunction). Sanchez was arrested, booked into jail, had to post bail, and was ultimately charged with violating the injunction on grounds of associating with another enjoined person (i.e., his brother). In other cases, for instance case Nos. 1471084 and 1471881, Sanchez was arrested and charged with violating the injunction for wearing, respectively, a black-and-red shirt and red shoes. In the trial court, in light of the facts of case Nos. 1450035 and 1468072, Sanchez argued that, under the injunction, he was subject to "arrest[ ] for associating with his family members, all of whom live within the 'safety zone' designated by the gang injunction." He also argued that the fact that "he is seen with his family is considered proof by the prosecution that he is a gang member."

The People argue that Mathews is inapplicable to the instant case. Rather, citing Medina v. California (1992) 505 U.S. 437, 443-446, 112 S.Ct. 2572, 120 L.Ed.2d 353, the People posit that Sanchez's due process claim must be analyzed under the standard enunciated in Patterson v. New York (1977) 432 U.S. 197, 201-202, 97 S.Ct. 2319, 53 L.Ed.2d 281. We reject this argument because Medina and Patterson addressed the analytical framework for assessing the constitutionality of state procedural rules, which are part of the criminal process. Sanchez does not challenge California criminal procedures but, rather, argues he was subjected to a civil public nuisance injunction in violation of his right to procedural due process. This claim is appropriately analyzed under Mathews .

Since Sanchez does not challenge the facial constitutionality of the injunction's terms, we address the scope of these terms only as necessary to evaluate Sanchez's procedural due process claim.

The injunction refers to "replica or imitation" weapons as defined in section 417.4.

In the trial court proceedings, the prosecutor advised the court that SCDA reviewed the ongoing application of the injunction to enjoined persons on an ad hoc basis, to ascertain whether any one should be exempted from enforcement of the injunction. However, the prosecutor clarified that "[as] yet" there was no "formal" removal process "in place" and, consequently, a removal process was "not part of the People's record" in the instant matter. The trial court ruled that since a removal process was "not part of the record," it was "not going to consider that at this time." At oral argument in this appeal, counsel for the People stated that during the pendency of this appeal, SCDA had independently modified the procedures used to enforce the injunction to institute, among other things, a removal process. However, any such later modifications were not available to Sanchez and are not part of the instant record. We therefore have not considered them. Nor do we express any opinion as to their adequacy in relation to the procedural due process issue raised here.

The People have attached as an exhibit to their opening brief, an investigation report by SCDA Gang Investigator Froilan Mariscal. The report is dated December 13, 2012, over two years after Sanchez was served with the gang injunction. In the report, which was not provided to the trial court , Mariscal enumerates various reported police contacts that Mariscal "utilized to document Carlos Sanchez as an active DSSN member." However, the report mostly lists contacts that occurred in the course of enforcing the injunction against Sanchez, after it was served on him. Furthermore, the report is dated December 13, 2012, and fails to clarify how the SCDA actually determined, at the time Sanchez was served with the injunction on August 17, 2010, that Sanchez was an active DSSN member subject to the injunction. For example, the report does not clarify what information was available to and evaluated by the SCDA prior to August 17, 2010, or whether any information available at that time suggested that Sanchez was not a gang member but was disregarded by the SCDA.

Officer Binkley testified at Sanchez's preliminary hearing that Investigator Mariscal provided a list of people to the Modesto Police Department for purposes of service of the injunction; the list included Sanchez. Mariscal's role was also confirmed by counsel for the People at oral argument.

Rackauckas noted that " 'in limited circumstances,' " " 'deprivations of liberty' " may be cured by " '[p]ost-deprivation procedures' " that " 'may provide adequate due process.' " (Rackauckas , supra , 734 F.3d at p. 1048, fn. 22 ; but see Bailey v. Pataki (2d Cir. 2013) 708 F.3d 391 [" '[w]here the State feasibly can provide a predeprivation hearing ... it generally must do so regardless of the adequacy of a postdeprivation ... remedy' "]; Zimmerman v. City of Oakland (9th Cir. 2001) 255 F.3d 734, 738 [holding postdeprivation remedies inadequate where a state officer "acted pursuant to some established procedure," as opposed to in "random, unpredictable, and unauthorized ways"].)

The City of Los Angeles has also offered various procedures in connection with enforcement of an anti-gang injunction, whereby individuals subjected to the injunction may challenge the underlying determination (made by the relevant public agency enforcing the injunction) that they were covered gang members. However, in Youth Justice Coalition v. City of Los Angeles (C.D. Cal. 2017) 264 F.Supp.3d 1057, 2017 WL 3981122 the court nonetheless found that the City's "procedures do not adequately remedy the lack of pre-deprivation process." (Id . at *10.)

The People argue that the trial court erred by failing to allow the People to file additional briefing when it reconsidered its ruling on Sanchez's due process challenge. We need not address the merits of this claim because the People have not demonstrated that any error by the trial court was prejudicial.

Sanchez has moved to strike five exhibits filed by the People with their opening brief (Exhibits A-E, numbering 59 pages). However, since we have ruled in Sanchez's favor, his motion to strike is denied as moot.