Filed 1/15/21  P. v. Zhou CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B301601 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA100202) |
| v. | |
| PHILIP CHUNYUAN ZHOU, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Thomas R. Sokolov, Judge.  Petition for writ of mandate denied.

Ray and Bishop, Fredrick M. Ray, Lindsay M. Johnson, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gloria L. Castro, Senior Assistant Attorney General, E. A. Jones III,

Supervising Deputy Attorney General, Joshua M. Templet, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant and appellant Philip Chunyuan Zhou appeals the trial court's order restricting his license to practice medicine in California as a condition of pre-trial release. We conclude that the trial court did not err in determining that Zhou posed an immediate risk to the public by "clear and convincing [proof] and to a reasonable certainty."

## FACTS AND PROCEDURAL HISTORY

### *The Alleged Offenses*

In September of 2018, Los Angeles Sheriff's Department (LASD) Detective Kalassay was contacted by the United States Department of Homeland Security (DHS), which informed him that three packages containing illegal narcotics had been intercepted at the International Mail Facility in Torrance, California. Detective Kalassay took possession of the packages, which contained 360 pills of Zolpidem, which is sold under the brand name "Ambien" and prescribed for sleeping disorders. Zhou's name and address were printed on the outside of the packages.

Detective Kalassay requested and received judicial approval for a contingency search warrant on September 20,

2018.  On September 21, 2018, members of the Health Authority Law Enforcement Task Force (HALT), LASD Major Crimes Bureau, and COPS team coordinated a package delivery/search warrant operation.  An undercover detective knocked on the door of Zhou's residence and asked for him.  Zhou accepted the package.  Detective Kalassay conducted a "knock notice" at the residence.  Zhou answered the door and was immediately detained without incident.  No other occupants were in the residence at that time.  In the bedroom that Zhou had identified as his own, detectives found the package delivered by the undercover officer and also discovered 310 Zaleplon capsules, 24 Xanax pills, 120 Soma tablets, and 57 Ritalin tablets.  All of the pharmaceutical drugs are controlled substances and dangerous drugs.  Zaleplon is used to treat sleeping disorders, Xanax is prescribed for anxiety and panic disorders caused by depression, Soma is a muscle relaxant and pain reliever, and Ritalin is prescribed to treat ADHD.  Numerous other pharmaceuticals were discovered in Zhou's closet.

Zhou was advised of his Miranda rights, and agreed to speak with Detective Kalassay without an attorney present.  Zhou reported that he was a resident physician in the neurology department at UCLA.  He had held that position for three years and had lived in the apartment where the search was conducted the entire time.  Zhou previously lived in Northern California and saw a primary care physician there who prescribed him medication for his medical

3

condition. Once Zhou moved to Southern California he ordered prescribed medication, including controlled substances, over the internet for convenience. Zhou was unaware that it was illegal to do so. Zhou said he self-medicated on an as needed basis, but denied having an addiction, and denied selling drugs. He stated that all of the pharmaceuticals were for his personal use.

Based on his experience and training, Detective Kalassay formed the opinion that Zhou was using and possibly selling the pharmaceuticals seized from his apartment. It would be unusual for a single individual to consume the amount of drugs confiscated.

Zhou was transported to the sheriff's station and booked into custody. Detective Kalassay confirmed that Zhou was a resident physician at UCLA. The detective confiscated Zhou's prescription pads and hospital identification card and delivered them to the manager of the Department of Health Services for safe keeping.

***Proceedings Before the Trial Court***

On May 21, 2019, a felony complaint was filed alleging that Zhou sold/offered to sell/transport a controlled substance, Zaleplon (Health & Saf. Code, § 11379, subd. (a) [count 1]), possessed for sale a controlled substance, Alprazolam (Health & Saf. Code, § 11378 [count 2]), and possessed for sale a controlled substance, Methylphenidate (Health & Saf. Code, § 11378 [count 3]). The Los Angeles

Sheriff's Department incident report and supplementary report relating to the incidents at issue, which were based on Detective Kalassay's personal knowledge and detailed the facts of the case as recounted above, was duly sworn by him and attached to the complaint. A warrant was issued for Zhou's arrest, with bail set at $90,000.

The case was called for arraignment on May 31, 2019. Zhou waived arraignment, and waived reading of the complaint and the statement of constitutional and statutory rights. He pleaded not guilty to all counts. Defense counsel moved to have Zhou released on his own recognizance, which motion the trial court denied, and then moved for a bail reduction from the amount set forth in the arrest warrant, which was granted, and the court set bail at $25,000. A hearing for setting preliminary hearing was scheduled for July 29, 2019.

In a letter dated June 5, 2019, the Osteopathic Medical Board of California (the Board) advised Zhou that it had been informed of his arrest, and required that a typed, detailed description of the incident be delivered to it no later than March 28, 2019.[1]

Zhou's attorney responded to the Board's request in a letter dated June 25, 2019, including the then-current case summary of the matter by the Superior Court, and stating that Zhou would not make any statements or provide any disposition documents while the criminal matter was

---

[1] This was evidently a typographical error, as the letter was sent several months after the purported due date.

pending. The letter informed the Board that the next calendar event in the criminal case was a preliminary setting appearance set for July 29, 2019.

On July 26, 2019, the Attorney General, on behalf of Mark Ito, Executive Director of the Board, filed a "Notice of Appearance by State Licensing Agency to Furnish Information Pertinent to Public Protection Pre-trial Release Condition Prohibiting Defendant from Use of License Issued by the Osteopathic Medical Board of California Pending Criminal Proceedings," stating its intention to appear at the July 29, 2019 hearing for the purpose of requesting that the court order Zhou to refrain from practicing medicine, to surrender all controlled substance prescription forms in his possession, and prohibit Zhou from obtaining, ordering, or using any additional prescription forms pending resolution of the criminal proceedings. The notice of appearance purported to be authorized pursuant to Penal Code sections 23, 1269c, 1270, 1275, and 1318, Business and Professions Code section 320, and Health and Safety Code section 11161.

At the hearing on July 29, 2019, the court received and filed Zhou's opposition to the Board's request. In the opposition, Zhou argued that (1) restriction of an occupational license as a condition of release violates due process, as articulated in *Naidu v. Superior Court* (2018) 20 Cal.App.5th 300 (*Naidu*) and *Gray v. Superior Court* (2005) 125 Cal.App.4th 629 (*Gray*), (2) the Board had produced no documentary evidence or oral testimony in support of the petition, thereby circumventing the due process

6

requirements set forth in *Naidu* and *Gray*, (3) the Board was not permitted to recommend suspension of an occupational license as a condition of release pursuant to Penal Code section 23, (4) suspension of Zhou's medical license as a condition of bail would violate Zhou's legal right to have his occupational license restricted after an interim suspension proceeding governed by Business and Professions Code section 494, and (5) the Board failed to show good cause or changed circumstances that would justify placing additional conditions on his release.

The parties stipulated to continue the July 29, 2020 hearing to September 11, 2019, as it pertained to the recommended suspension of Zhou's medical license.

On September 9, 2019, the Board filed a memorandum of points and authorities in support of its request to have Zhou's medical license restricted as a condition of bail. The Board argued that (1) it was authorized to appear pursuant to Penal Code section 23, (2) the restriction on Zhou's medical license was authorized to protect public safety, (3) the restriction on Zhou's medical license was reasonable under the circumstances because the crimes were substantially related to Zhou's profession, (4) *Gray* and *Naidu* do not stand for the proposition that due process prohibits restricting a license to practice medicine as a condition of bail, and (5) utilization of administrative procedures would cause conflicts between parallel proceedings and increased expense. The Board further argued that the court could require Zhou to surrender all

7

controlled substance prescription forms on motion of a law enforcement agency supported by reasonable cause under Health and Safety Code section 11161.

The following documents were attached to the Board's memorandum of points and authorities: (1) the declaration of Deputy Attorney General Brian Roberts, (2) the Osteopathic Medical Board of California's Licensing Details for Zhou, dated July 22, 2019, which reflected no adverse actions taken against Zhou, (3) the Los Angeles Sheriff's Department incident report and supplementary report authored by Detective Kalassay, and (4) the California Department of Justice's Controlled Substance Utilization Review and Evaluation System's Patient/Client Activity Report for Zhou.

Zhou's opposition to the Board's request to restrict his license was received and filed at the hearing on September 11, 2019. The opposition reiterated the legal arguments in his earlier-filed opposition. Zhou emphasized that the Board failed to offer evidence of potential harm to the public. He had no known complaints from patients and an exemplary record. Zhou also attached to the opposition a Physician Evaluation Form completed by his supervisor reflecting his superior performance in all areas evaluated, and stating, "He is quite knowledgeable and will be a great asset to any hospice agency," a letter of recommendation from his colleague and roommate, chief resident Dr. Tony Pang, a letter of recommendation from his wife, Oanh Truong, and certificates for continuing medical education.

At the hearing on September 11, 2019, the court preliminarily noted that the Attorney General had previously filed a motion to suspend Zhou's medical license, which the court had been prepared to hear on July 29, 2019. It did not hear the motion that day because the parties stipulated to continue the hearing to September 11, 2019. The court stated that, ordinarily, the law would require that unless there was a change in circumstances the court could not change the conditions of bail. The court believed that in the current situation, where the defendant had agreed to continue the hearing, this rule did not apply, and it could consider whether to impose additional conditions although there had been no change in circumstances and bail had been set previously. The court asked the Attorney General to explain why it had taken so long to request that Zhou's license be suspended, and invited the parties to argue their positions.

The Attorney General explained that any delay in the Board's motion was due to the process that was routinely followed when the Board transmits a referral to the Attorney General, who then has to review it as well. The Attorney General then argued that, with respect to the Board's burden, decisions at bail hearings are often based on hearsay, and that oral testimony was unnecessary. Under Penal Code section 1204, the court could rely upon the reports of law enforcement to set bail.

The court responded that it would not prohibit either party from presenting any evidence that party deemed appropriate.

Defense counsel argued that oral evidentiary testimony was necessary due to the drastic measures that were being considered. Zhou was entitled to a full evidentiary hearing. There had been no change in circumstances that would warrant a change in conditions of release, and new conditions could not be imposed in the absence of changed circumstances. The People had delayed in bringing the matter significantly. Regardless of when the Attorney General became aware of the issue, the Board had been aware of it for a significant time period, and had not acted with any urgency, or taken any action that demonstrated that Zhou represented a concern. Had there been a concern, the matter could have already been heard under Business and Professions Code 494. Moreover, no patient had raised a complaint, nor had any colleague raised a concern that Zhou was impaired in any way. Zhou had not been found guilty of any crime, and he had a vested interest in keeping his medical license. No evidence had been presented other than a "very scant police report which hasn't been proven up."

Defense counsel further argued that, if there were a public concern, less stringent measures for protecting the public should be considered. Zhou agreed to be routinely tested for drug use, and to work under supervision.

The court stated that it understood the burden of proof was "clear and convincing and to a reasonable certainty as

far as the court granting the motion." In this case, the drugs had been delivered to Zhou, his name was on the package, and he admitted to receiving them. Zhou could only have possessed the drugs for one of two reasons: (1) personal use, or (2) sale. Regardless of whether the case involved a consumer complaint, under either scenario—personal use or sale—he presented a real danger to the public.

Defense counsel responded that there were steps the court could take that were less drastic than suspending Zhou's license. Zhou could be randomly drug tested. There was already a system in place because the Board routinely drug tested individuals on probation. It would also be possible to restrict Zhou's license instead of fully suspending it.

The Attorney General countered that there could be no doubt that Zhou presented a danger to the public, particularly if he were allowed to continue to prescribe drugs. The Attorney General could not limit Zhou's D.E.A. license, and doubted whether the court could order the Board to accept Zhou into its probation program for the purpose of drug testing.

Defense counsel acknowledged that Zhou's D.E.A. permit was not under the Board's control, but asserted that it could be addressed in the court's order. The court could also order drug testing. Zhou could agree to the testing as a condition of bail.

The court expressed its reluctance to take the drastic action of suspending Zhou's license, and stated that it had

considered alternative methods to protect the public. However, in light of the serious public safety concerns, the court granted the motion to suspend Zhou's license as a condition of bail.

Zhou appealed to this court on September 23, 2019.

## DISCUSSION

Zhou argues that the trial court lacked authority to suspend his medical license as a condition of release because (1) due process prohibits suspension of an occupational license as a condition of bail, (2) Penal Code 23 does not authorize a licensing agency to make recommendations regarding conditions of bail, (3) suspension of Zhou's medical license is governed by the Administrative Procedure Act, and (4) the terms for release on bail may not be increased absent a showing of good cause or changed circumstances.[2]

### *Appealability and Standard of Review*

The Attorney General contends that Zhou's appeal must be dismissed because the trial court's order imposing a condition of bail is not an appealable order. We agree that the order is not reviewable on direct appeal. "'The right to appeal is statutory only, and a party may not appeal a trial court's judgment, order or ruling unless such is expressly

---

[2] Zhou phrases many of his arguments as violations by the Board, which is not a party to this appeal.

made appealable by statute.' [Citation.]" (*Gray v. Superior Court* (2016) 247 Cal.App.4th 1159, 1163.) There exists no such statutory authority; a challenge to a condition of bail must be made by extraordinary writ. (*In re Catalano* (1981) 29 Cal.3d 1, 8 (*Catalano*) ["a prisoner released on bail, although not actually confined, is eligible to seek habeas corpus"]; *In re Humphrey* (2018) 19 Cal.App.5th 1006, 1022 [habeas corpus is the proper vehicle by which to question the legality of a bail grant or deprivation]; *In re McSherry* (2003) 112 Cal.App.4th 856, 859–860 [same].) Nevertheless, in appropriate circumstances, we may treat a direct appeal from a non-appealable order as a writ of habeas corpus in the interests of judicial economy. (*People v. Segura* (2008) 44 Cal.4th 921, 928, fn. 4 [defendant's appeal from trial court's denial of post-judgment motion to reduce the jail term included in his conditions of probation properly treated by court of appeal as a writ of habeas corpus].)

Although a petition for writ of habeas corpus is normally the vehicle for challenging a bail condition, a writ of mandate is also appropriate in cases like the instant one in which the defendant seeks "'to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station' . . . [Citations.]" (*Flores v. Department of Corrections & Rehabilitation* (2014) 224 Cal.App.4th 199, 205.) Under unusual circumstances, where doing so would serve the interests of justice and judicial economy, an appellate court may exercise its discretion to construe an appeal as a petition for writ of mandate.

(*Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 732.)

We have such a situation before us. In this case, Zhou's medical license has been suspended for a substantial period of time. Any other potential avenue of relief would significantly prolong Zhou's uncertainty regarding his ability to practice medicine, and involve unnecessary duplicative effort and use of resources by this court. Moreover, as "the issue is purely legal in nature, there is no need for an evidentiary hearing permitted by the procedures governing habeas corpus petitions." (*Gray, supra,* 125 Cal.App.4th at p. 636, fn. 3.) Accordingly, we construe the appeal as a petition for writ of mandate.

Because the matter before us presents a pure question of law, we review the trial court's order setting bail conditions de novo. (*Naidu, supra,* 20 Cal.App.5th at p. 306.)

### *Trial Court's Authority*

Zhou's arguments on appeal ultimately pose two questions: (1) whether a trial court may impose additional conditions after bail has been posted, and (2) whether the suspension of Zhou's medical license was proper in this case.

14

## Authority to Impose Additional Conditions After Bail is Posted

Our Supreme Court has held that trial courts may impose reasonable conditions of bail with a sufficient nexus to public safety, and may do so even after a defendant has posted bail. (*In re Webb* (2019) 7 Cal.5th 270, 277–278 (*Webb*).) In *Webb*, the defendant was arrested, and charged with two felony counts. She posted bail and was released. At arraignment, the trial court imposed as an additional condition of release that the defendant waive her fourth amendment right to be free of warrantless and unreasonable searches. (*Id.* at p. 271.) The defendant challenged the search condition by writ of habeas corpus in the Superior Court and her petition was denied. She then filed a petition for writ of habeas corpus in the Court of Appeal, "'contending the magistrate lacked statutory or inherent authority to impose the bail search condition, and imposition of the condition constitutes a pretrial restraint without due process protections such as notice and a hearing or any showing that she poses a heightened risk of misbehaving while on bail.' [Citations.]" (*Id.* at p. 272.) The Court of Appeal issued an order to show cause and ultimately concluded that the court lacked authority to impose the condition. (*Ibid.*) It did not reach the question of whether the defendant's due process rights to notice and a fair hearing were violated by imposition of the condition. (*Id.* at pp. 272–273.)

The District Attorney petitioned for review on the issue of whether "'trial courts possess inherent authority to impose reasonable bail conditions related to public safety on felony defendants who are released on monetary bail.'" (*Webb*, *supra*, 7 Cal.5th at p. 273.) The Supreme Court answered the question in the affirmative. It held, "trial courts have authority to impose reasonable conditions related to public safety on persons released on bail. We need not here consider in detail the exact contours of this authority. We stress, however, that, as the concurring justice noted below, this authority is 'fairly narrow.' [Citation.] Any condition must be *reasonable*, and there must be a sufficient nexus between the condition and the protection of public safety."[3] (*Id.* at p. 278.)

In light of *Webb*'s holding that the trial court has authority to impose bail conditions, we need not address whether the Board was authorized to appear to make recommendations regarding conditions of bail under Penal Code section 23,[4] as the trial court's order would not become

_____

[3] The *Webb* court noted that "[t]he district attorney expressly did not seek review of the specific question 'of whether the bail condition imposed in this case was a proper exercise of the trial court's inherent authority.'" (*Webb*, *supra*, 7 Cal.5th at p. 274.) For this reason, and because the question had become moot as to the defendant, the court did not address it. (*Ibid.*)

[4] As relevant here, Penal Code section 23 provides that "In any criminal proceeding against a person who has been

16

invalid simply because the Board purported to appear pursuant to that section.

We reject Zhou's argument that the People must demonstrate good cause or changed circumstances before the trial court may impose additional conditions of release pursuant to Penal Code section 1289. First, Penal Code section 1289 provides in pertinent part: "After a defendant has been admitted to bail upon an indictment or information, the Court in which the charge is pending may, upon good cause shown, either increase or reduce the amount of bail." The statute refers to the "amount of bail," not the "conditions of bail," which indicates that the Legislature intended that it apply to monetary bail, and not conditions of release. (*People v. Statum* (2002) 28 Cal.4th 682, 690 ["The plain language of the statute establishes what was intended by the Legislature"].) Second, in *Webb*, in which Penal Code section 1289 would have been directly

issued a license to engage in a business or profession by a state agency pursuant to provisions of the Business and Professions Code or the Education Code, or the Chiropractic Initiative Act, the state agency which issued the license may voluntarily appear to furnish pertinent information, make recommendations regarding specific conditions of probation, or provide any other assistance necessary to promote the interests of justice and protect the interests of the public, or may be ordered by the court to do so, if the crime charged is substantially related to the qualifications, functions, or duties of a licensee." Zhou argues that the Board may appear to make recommendations of conditions of probation but not conditions of bail.

implicated if it were applicable, the Supreme Court placed no such restraints on the trial court. While we recognize that *Webb* does not expressly hold that Penal Code section 1289 is inapplicable, we find its omission from the discussion significant. Third, we are inclined to agree with the trial court that, even if Penal Code section 1289 is generally applicable to release conditions, in a case where the court is prepared to consider conditions of release at the time it sets bail, but the defendant stipulates to continue the matter with respect to release conditions, the People should be excepted from demonstrating that good cause or changed circumstances compel additional conditions.

## Authority to Suspend Zhou's Medical License in This Case

Citing to *Gray*, *supra*, 125 Cal.App.4th 629, and *Naidu*, *supra*, 20 Cal.App.5th 300, Zhou argues that conditioning bail upon the restriction of his occupational license, which is a vested property right, necessarily violates due process. Neither case so holds.

In *Gray*, the Court of Appeal considered whether the trial court could prohibit a physician—who was charged, among other things, with unlawfully prescribing and possessing controlled substances—from practicing medicine as condition of bail, at the request of the Medical Board of California. The *Gray* court held that "the bail condition Gray challenges is not per se unreasonable. The Medical

18

Board could legitimately achieve the same result through a variety of procedures available to it.  What makes the condition unreasonable is that its imposition violated Gray's right to procedural due process . . . ."  (*Gray, supra,* 125 Cal.App.4th at p. 643.)

The Court of Appeal in *Naidu* agreed.  There, the court considered whether the trial court could suspend two contractors' occupational licenses as a condition of bail.  The *Naidu* court cited *Gray* with approval:  "*Gray* acknowledges that the bail condition at issue there was 'not per se unreasonable.'  [Citation.]  To borrow words from *Endler* [*v. Schutzbank* (1968) 68 Cal.2d 162, 170]:  'We are thus concerned here not with the *ends* which might justify governmental restrictions upon the right to follow a chosen profession but only with the *means* which government must employ in enforcing admittedly permissible restraints.' [Citation.]"  (*Naidu, supra,* 20 Cal.App.5th at p. 309.)

Thus, neither case held that the suspension of an occupational license as a condition of bail was a violation of due process per se.  Both cases did hold, however, that when a trial court imposes a bail condition that implicates a fundamental liberty such as engaging in one's occupation, due process requires that certain procedural protections apply.

In *Gray*, the court concluded that "[t]he trial court significantly impaired Gray's freedom to pursue a private occupation without giving him notice, an effective opportunity to confront the charges or witnesses against

19

him, or a full hearing, in violation of his due process rights."
(*Gray*, *supra*, 125 Cal.App.4th at p. 638.)  The Court held
that "[a]t a minimum, the suspension must be based on
evidence showing an immediate risk to the public.  . . .  [T]he
Medical Board seems to suggest it can seek an immediate
and indefinite suspension of a medical license without
notice, evidence, or an adequate opportunity to litigate the
issues, simply because criminal charges have been filed.  We
find no support for the proposition that the due process and
proof required for a license suspension may be ignored when
a criminal complaint has been filed against a licensee."
(*Gray*, *supra*, at p. 640.)

The *Naidu* court stated, "under both state and federal
law, 'due process is flexible and calls for such procedural
protections as the particular situation demands.'  (*Morrissey
v. Brewer* (1972) 408 U.S. 471, 481 [(*Morrissey*)]; see [*People
v.*] *Ramirez* [(1979)] 25 Cal.3d 260, 268 [(*Ramirez*)] [same].)
The federal due process inquiry "'must begin with a
determination of the precise nature of the government
function involved as well as of the private interest that has
been affected by governmental action.'"  (*Morrissey*, at
p. 481.)  Similarly, under California law, 'the extent to which
due process relief will be available depends on a careful and
clearly articulated balancing of the interests at stake in each
context.  . . .  More specifically, identification of the dictates
of due process generally requires consideration of (1) the
private interest that will be affected by the official action, (2)
the risk of an erroneous deprivation of such interest through

20

the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, (3) the dignitary interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible governmental official, and (4) the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' (*Ramirez, supra,* 25 Cal.3d 260 at p. 269.)" (*Naidu, supra,* 20 Cal.App.5th at p. 311.)  The court acknowledged that protection of the public safety was the "'primary consideration,'" but rejected "any notion that the People have an interest in protecting the public at the expense of a criminal defendant's due process rights, and, as we have intimated, due process requires that at least some evidence of danger to the public support an order suspending a business license as part of a bail order." (*Id.* at pp. 312–313.)

The *Naidu* court concluded that the trial court had violated the defendants' due process rights in that case. (*Naidu, supra,* 20 Cal.App.5th at p. 314.)  The only "evidence" the People presented of the defendants' dangerousness was counsel's declaration stating that the Contractors State License Board's position that it believed the defendants were dangerous and that their licenses should be suspended pending the outcome of the criminal proceedings.  (*Id.* at p. 313.)  Counsel's statements were not

21

evidence absent a showing that the statements were made on the basis of personal knowledge. (*Id.* at pp. 313–314.)

The *Naidu* court rejected the People's argument that defendants' licenses could be suspended based on the filing of a felony complaint. (*Naidu*, *supra*, 20 Cal.App.5th at pp. 314–319.) The People argued that there were several cases in which a suspension of an occupational license met the requirements of due process where an information or indictment had been filed. The *Naidu* court distinguished these cases, explaining that "the first pleading in a felony case (i.e., an indictment or information) is supported by conclusions drawn by a magistrate or grand jury after presentation of evidence. In contrast, the complaint in a felony case is not supported by evidence but instead begins the process of introducing it." (*Id.* at p. 316.) The filing of an information or indictment was sufficient in the cases the People relied upon, because there had been "some form of factfinding before the suspension of the license to practice a trade [was] '[]justified.' [Citation.] Either an information or an indictment will likely demonstrate that such factfinding has occurred, and that there is probable cause to think a crime was committed by the defendant(s)." (*Id.* at p. 317.)

The *Naidu* court concluded that "[D]ue process requires only a showing of probable cause that a criminal defendant poses an immediate risk of danger to the public if allowed to continue to operate under a professional license in order to ensure that the suspension is not arbitrary, baseless, or unwarranted. ([*Federal Deposit Insurance*

*Corporation v.*] *Mallen* [(1988)] 486 U.S. [230,] 240–241, 244; *American Liberty* [*Bail Bonds, Inc. v. Garamendi* (2006)] 141 Cal.App.4th [1044,] 1060; [*Gilbert v.*] *Homar* [(1997)] 520 U.S. [924,] 934.)  Unless a defendant can show that a different standard is specifically required by a statute applicable to the inquiry, we see no reason to depart from the probable cause requirement." (*Naidu*, *supra*, 20 Cal.App.5th at p. 319.)

Here, the parties disagree as to the appropriate burden of proof.  The People argue that the evidence need only be sufficient to establish probable cause that Zhou posed an immediate risk to the public, as the court held in *Naidu*. Zhou argues that the standard of proof needed to support a final decision restricting or revoking a medical license in an administrative proceeding is clear and convincing proof to a reasonable certainty, and that a lesser standard would be inappropriate.  (*Ettinger v. Board of Medical Quality Assurance* (1982) 135 Cal.App.3d 853, 856.)  The trial court employed the more stringent clear and convincing standard that Zhou advocates.  Because we conclude that the evidence was sufficient for the trial court to find that clear and convincing proof to a reasonable certainty supported suspension of Zhou's license, we need not address the issue further.

In this case, Zhou received the appropriate due process protections.  With respect to notice, he was first informed of the Board's intention to appear and recommend suspension of his license on July 29, 2019, approximately six weeks prior

23

to the bail condition hearing. The Board filed its recommendation on September 9, 2019, two days before the hearing took place. Defense counsel timely filed an opposition to the recommendation at the September 11, 2019 hearing, which the trial court reviewed and considered. The opposition argued that the limited time for preparation was a violation of due process, but defense counsel did not request a continuance to better prepare for the hearing, or object that Zhou would present additional evidence at a hearing given adequate opportunity. In short, notice seems to have been adequate to permit Zhou to respond to the Board's recommendation. As we will discuss *post*, the evidence that supported the trial court's finding was Detective Kalassay's sworn statement in the investigative report, which was attached to the complaint. Defense counsel could not have been surprised by the report. To the contrary, she would have had access to it prior to July 29, 2019, when the Board first announced its intent to make the recommendation, and therefore had the opportunity to prepare to rebut the statements contained therein.

Additionally, Zhou was afforded the opportunity for a full and fair evidentiary hearing. The parties agreed to continue the proceedings on the issue of the recommended license suspension from July 29 to September 11—i.e., the entirety of the September 11 hearing was devoted to the issue of Zhou's licensure. Although defense counsel argued that Zhou was entitled to a full evidentiary hearing, she did not explain what aspect of the September 11 hearing was

lacking, or state what, if any, evidence she was unable to proffer or rebut at that time. In fact, the trial court stated clearly that it was "not limiting either side from presenting any evidence they deem appropriate." Defense counsel did not complain following the trial court's invitation, or request a continuance to gather additional evidence, or proffer that there was additional evidence that could be presented at a later time. Under the circumstances, we cannot say that Zhou was hampered in his defense.

Finally, clear and convincing proof to a reasonable certainty supported the trial court's ruling. Detective Kalassay's incident report, which contained his sworn statements describing his personal knowledge of the case, was attached to the complaint. In it, the detective stated that Zhou accepted the illegal drugs that were addressed and delivered to him in the undercover operation. The detective was involved in the search and seizure operation. He was present when some of the controlled substances were discovered in the bedroom that Zhou identified as his own, and assisted in cataloguing the drugs. Detective Kalassay also spoke with Zhou, who admitted that he had ordered controlled substances from foreign countries without a prescription for his personal use.[5] Zhou was a medical doctor who had access to controlled substances and was authorized to write medical prescriptions. These facts constituted clear and convincing proof to a reasonable

_____

[5] Zhou never refuted that he made any of these statements to Detective Kalassay.

25

certainty that Zhou presented an immediate risk to the public safety either through prescribing and selling controlled substances in cases where there was no medical justification, or through abusing the drugs himself.[6]

Moreover, the trial court took the relevant factors in Zhou's favor into consideration. The court heard and considered argument regarding less stringent alternatives to suspension of Zhou's medical license, but found them unsatisfactory. The court understood the gravity of its ruling and the effect that it would have on Zhou, and informed the parties that it was "very reluctant" to take this "very drastic action," but found that Zhou's personal interest in his medical license was outweighed by the risk of harm.

---

[6] The present case differs significantly from *Naidu*, where the evidence essentially consisted of the bare allegations in the complaint. Here, it is not the complaint that supports the trial court's order but the sworn statements attached thereto, upon which the trial court based its findings.

## DISPOSITION

The Peoples' request for judicial notice filed August 28, 2020 is granted.

Zhou's request for judicial notice filed September 16, 2020 is granted.

The petition for writ of mandate is denied.

MOOR, J.

We concur:

RUBIN, P. J.

BAKER, J.